IN RE M., NEGLECTED CHILDREN.

[Cite as In re M. (1979), 65 Ohio Misc. 7.]

(Nos. 261485 and 267737—Decided August 14, 1979.)

Court of Common Pleas of Cuyahoga County, Juvenile Court Division.

*Mr. Charles Cohen,* for County Welfare Dept., Social Services.

*Mr. George L. Nyerges,* for mother.

*Ms. Margaret Terry,* guardian ad litem for the children.

WHITLATCH, J. This matter comes before the court on the motion of the Cuyahoga County Welfare Department - Social Services, hereinafter referred to as the agency, to terminate its custody of the children herein and to return the children to the custody of their mother. The court's experience in this case demonstrates the need for a comprehensive plan designed to rehabilitate and reunify the family when children are removed from their home and committed to the temporary custody of a social agency. Our experience has further

demonstrated the correlative necessity of the court's insistence that a conscientious effort be made by the social agency to bring the plan to fruition before considering placing the children for adoption. The courtroom litigation of the issues involved in these cases took place many months ago. Our ruling on the motion now before us represents the successful culmination of the plan to rehabilitate and reunify the family. While it was a motion of the mother to return the two youngest children, Judy and Willard, to her care and a counter motion of the county welfare department for permanent custody of these two children for the purpose of adoption that last brought this matter before the court, it is essential to the understanding of this matter to briefly review not only the case of Judy and Willard but also the case of their three siblings, Robert, Julia and Eugena.

Judy M. hereinafter referred to as the mother, is the mother of five children: Robert, born 10-30-64, and Julia, born 1-22-67, are the children of her deceased husband; Eugena, born 8-2-68, and twins, Willard and Judy, born 11-16-70, were fathered by a Mr. W. with whom the mother cohabited for several years and whose existing valid marriage to another woman prevented the consummation of a common-law marriage between him and the mother.

Robert, Julia and Eugena were adjudged neglected children by this court on 3-27-70 in cause No. 261485, and the infant twins, Willard and Judy, were adjudged neglected children in cause No. 267737 on 12-18-70; both actions were brought under R. C. 2151.03. All five children were committed to the temporary custody of the agency.

In brief, the neglect in both actions was occasioned by repeated, brutal, physical assaults on the mother by Mr. W. in the presence of the children. Efforts to break up this pathological relationship and establish the mother and the children in a household separate from Mr. W. were unavailing, necessitating the placement of the children in foster homes.

It is noteworthy that the mother did not physically neglect the children or abuse them in any way. The children were kept clean, adequately fed and clothed while in her care. The mother's housekeeping standards have always been quite satisfactory. Had it not been for the repeated beatings of the mother by Mr. W., causing great emotional trauma to the

children, and in one instance resulting in the mother being placed temporarily in a psychiatric hospital, it is unlikely that the children would have been removed from her custody. While the mother experienced a very deprived childhood and was at one time placed in the Columbus State School for the Retarded, the court psychologist found that her I.Q. was 85 when adjusted for lack of education.

Several hearings were had in 1973 and 1974 on motions of the mother to have the children returned to her care. Mr. W. had been imprisoned in the house of correction but escaped therefrom and there was some evidence that he and the mother had resumed their relationship. In June of 1974 the court became convinced that the mother was no longer consorting with Mr. W. and ordered Robert, the oldest boy, returned to the home. At the request of the court, a psychologist at Beechbrook, a residential treatment center for disturbed children, where Eugena was in placement, undertook the assignment of improving the relationship between Julia and Eugena and their mother. Prior to this the agency had favored these children remaining with their foster parents. The psychologist's therapy sessions with the mother, Julia and Eugena, resulted in the return of the children to the mother's home.

As we considered the motions in relation to the twins, Willard and Judy, (the agency's for permanent custody and the mother's to terminate the agency's custody) we, of course, took into account the experience of the three children who had been returned to the mother's home. Robert had been there for almost three years, Julia for eighteen months and Eugena for fourteen months. All three children were reported as doing remarkably well at home, in school and in the community. Their school records were outstanding: Robert and Julia received practically all A's with corresponding high marks in "personal and social growth." Eugena, who was formerly so disturbed as to necessitate her placement in a treatment facility at a considerable cost to the county was enrolled in a learning disability class in the Cleveland public school system where she showed vast improvement. The comment of her teacher is worth noting: "Gena has matured and cooperated since school began. She seems to be *a much happier child* and it is reflected in her progress in her academic work." (Emphasis added.)

Under the general policy of the agency, the successful return of the three eldest children to the mother's home would have prompted the agency to work toward the early return to her home of the children remaining in placement. However, in this case the agency made no movement to return the twins, Willard and Judy, to the mother's care. Whereupon counsel for the mother filed the motion to terminate the custody by the agency of Willard and Judy and the agency countered by filing the motion for the permanent custody of the children. The molther naturally asserted that by her exemplary care of the three eldest children she had demonstrated that she was well able to care for the twins. The agency contended that while the mother could adequately care for three of her children, she could not cope with the five of them. The agency conceded that the three older children were receiving good care in their mother's home and were presenting no problems, but contended that these children had been with the mother in their early years and therefore recognized and accepted her in the maternal role. The agency claimed that Judy and Willard, who had been in foster home placement since they were a month old, would not be able to accept the mother in her natural role and that the children would undergo severe emotional trauma in any attempt to transfer them from the foster home to the mother's home.

It was the contention of the agency and the guardian ad litem that the foster parents had become the "psychological parents" of Willard and Judy. The agency supported its contention with the expert testimony of caseworkers, a psychologist and a psychiatrist. The term "psychological parent" has gained considerable currency in the social work community since the publication in 1973 of the book Beyond the Best Interests of the Child, by Goldstein, Freud and Solnit (McMillan Publishing Company). The socio-psychological theory of the book is summarized in *Montgomery Co. Dept. of Soc. Services* v. *Sanders* (1978), 38 Md. App. 406, 412, 381 A. 2d 1154, as follows:

"Under the 'psychological parenthood' principle, separation from the natural parent for a sufficient length of time saps the bond of love and affection between child and parent while simultaneously forging a strong psychological link which joins the child to a surrogate parent. Under those given circum-

stances, the surrogate parent becomes the 'psychological parent,' the one to whom the child turns for security, love, and a sense of emotional well-being. After the shift of allegiance by the child to the 'psychological parent' is completed, a return to the biological parent would, theoretically, result in severe emotional trauma, detrimental to the child's best interests."

This book does not present a new concept to this court; on several occasions we have resolved custody matters involving "psychological parents." In our opinion, psychological parenthood comes about when the child is with the same foster parents to the complete or almost complete exclusion of the natural parent or parents in the early years of childhood. However, the presence of and visitations by the natural parent create a discontinuity in the close attachment of the child and the foster parent which prevent the psychological parent and child relationship from developing. As long as the natural parents are maintaining a relationship with the child, the foster parents do not think of themselves as the child's parents. Even though they are fond of the child, psychologically they do not allow themselves to believe that the foster child is theirs. This must be particularly true of foster parents such as Judy's and Willard's who have had other foster children in their care from whom they have been later separated. The visitations by the parent, likewise, prevents the child from forging a strong psychological bond to the foster parents.

In the instant case the mother had visited with the children ever since their birth and had done so in spite of visitation arrangements which left much to be desired. Willard and Judy were in a foster home in Madison, Ohio, and transporting the children to and from Cleveland for the visits presented great problems for agency staff, frequently resulting in cancellation and postponement of visitations. For example, a Christmas visit was cancelled after the mother and the three children at home had made great preparations by way of a Christmas tree and gifts. Recognizing that there is a paucity of foster homes the court does not fault the agency for having placed the children some sixty miles from the mother's home. However, we believe that the logistical and staff problems created by a distant placement are not valid reasons for denying the mother regular and frequent visitations with her

children. The agency was required to find the staff and means of transportation to enable it to carry out its responsibilities.

Prior to court's specific instructions for bi-monthly visits in the mother's home, the visitations had been at the agency's office. All visits both in the office and in the home had been under the personal surveillance of the agency's caseworker. There appeared to be no good reason for supervising the visits and it seemed to the court that the very presence of the caseworker stifled the development of a normal parent and child relationship. The agency caseworker reported that Judy and Willard disliked visiting with the mother and were usually very disturbed by the visits. Interestingly enough, we had these same reports from the agency as to the visits of Julia and Eugena before they were returned to the mother. The court was inclined to believe that it was the infrequency of the visits and the fact that the mother was uncomfortable in the caseworker's presence that militated against satisfactory visitations.

Everything considered, it appeared that the agency had decided that Judy and Willard were to be placed for adoption long before it filed its motion for permanent custody. It was the agency's plan to place Judy and Willard for adoption with their foster parents. From the agency's reports these were estimable people who had given the children good parental care. However, in addition to our conviction that given the proper visitation arrangements these children could be integrated into their own family, there was a significant consideration which weighed heavily against adoption by the foster parents. The foster mother had obtained information to the effect that the natural mother was "severely disturbed" and that one child, Eugena, was brain damaged and had emotional problems. While the mother has intellectual limitations, she is not severely disturbed and Eugena, probably a learning disabled child, was neither disturbed nor brain damaged and was thriving in her mother's care. The court agrees with the clinical psychologist, who examined Judy at University Hospital, who concluded that the foster mother's misinformation as to Judy's family lowered her expectations for Judy or created the expectation that Judy would in some way be disturbed or deviant. Such expectations would not augur well for a successful parent and child relationship.

A cogent reason for rejecting any plan for adoptive placement for Judy and Willard was that this would entail the separation of these children from their siblings, probably forever. Judy and Willard and the three children in the mother's home have a right to the companionship of each other. A child should grow up as a part of its natural family and the role of the state should be to do everything that can be done to support the family and hold it together. Reddick: Sibling Rights in Legal Decisions Affecting Children, 25 Juvenile Justice, No. 3, November 1974. Children of a family should be kept together "so that they may grow up together and enjoy the advantages of mutual companionship, love and protection." *Brashear* v. *Brashear* (Idaho 1951), 228 P. 2d 243. Children should not be separated from each other except for a most compelling cause. *Arons* v. *Arons,* (Fla. 1957), 94 So. 2d 849; 27B Corpus Juris Secundum, Section 308. In *Howard* v. *Howard* (1948), 307 Ky. 452, 458, 211 S.W. 2d 412, we find the following: "[C]hildren of the same parentage should live together as members of the same family and not be separated whereby their natural affection for each other becomes dimmed and sometimes entirely fades away, thereby losing the benefits of constant association as nature intended."

The court does not lightly brush aside the recommendation of psychologists and psychiatrists. However, we are much aware of the dependence of these clinicians upon the reports of the social workers assigned to the case by the agency which is one of the adversaries in this custody dispute. Further, as we said in *In re Larry and Scott H.* (1963), 92 Ohio Law Abs. 436, 442, 192 N.E. 2d 683:

"The distinction between the role of the judge and the clinician must not be blurred. It is the clinician's job to make findings and recommendations; it is the judge's job to make the decision after careful consideration of the clinical reports and the other evidence in the case."

The basis for the neglect complaint as to Willard and Judy was that they lacked proper parental care because of the "faults and habits" of the mother, primarily her pathological relationship with Mr. W. These faults and habits no longer existed and certainly the fact that *these* particular "faults and habits" once existed did not render the mother incapable of giving the children proper parental care. *In re. Hock* (1947), 55

Ohio Law Abs. 73. As is said *In re Burkhart* (1968), 15 Ohio Misc. 170, 174, 239 N.E. 2d 772, where a child has been removed from the temporary care of its parents because of neglect or inability to discharge legal responsibility the child should be returned to parental custody if the parents and their circumstances change sufficiently to warrant the same.

A conclusion that the mother was not capable of caring for Willard and Judy would have required the court to disregard the excellent care she was giving Robert, Julia and Eugena and her persistence in continuing her maternal relationship with Willard and Judy. Such a conclusion would be contrary to common sense and devoid of humanity. A succinct statement of the state's concern regarding the protection of parental rights is contained in *Williams* v. *Williams* (1975), 44 Ohio St. 2d 28, 29:

"In our society, the parent-child relationship is special, invoking strong feelings of love and affection. Therefore, the possible severance of that bond***must be guarded by procedures which give effect to the rights of***parents.***"

In light of the foregoing the court was in disagreement with the caseworkers, the clinicians employed by the agency and the guardian ad litem for the children, who argued that it would be in the best interest of Judy and Willard that the mother's parental rights be terminated so that Judy and Willard could be placed for adoption. Neither did we agree with counsel for the mother that the agency's custody should be terminated and the children returned forthwith to the mother. Accordingly, we denied both the mother's motion to terminate the custody of the agency and the agency's motion for permanent custody. At our suggestion, the foster home caseworker, who so strongly favored adoption by the foster parents, withdrew from the case and Willard and Judy were assigned to the caseworker in charge of the three children in the mother's home. We ordered that the children visit in the mother's home at least every two weeks for several hours at a time, that these visits not be under the surveillance of the caseworker and that arrangements be made after several such visits for Judy and Willard to have overnight visits with their mother and their siblings. These visitation arrangements were successfully carried out. Our purpose of reintegrating Judy and Willard into the mother's family was accomplished and

Willard and Judy were placed in the mother's home within a few months. Although all the children were now in the physical custody of the mother, they remained in the legal custody of the agency with the agency providing the supervision and supportive services.

Judy and Willard have now been in their mother's home for 18 months. The agency's social worker in support of the motion for the termination of the agency's custody of all five children and their return to the legal custody of the mother reported as follows:

"The children maintain good attendance records at school and all of them are doing well scholastically. Despite the difficulties involved in raising five children, Mrs. M. has demonstrated her ability to successfully care for these children. Her housekeeping standards are very good. She has also shown good ability to successfully manage on a limited income of ADC and Social Security. The mother is cooperative with the schools and makes appropriate contact with the school staff as needed. The children seem to have a good relationship with each other. Robert is particularly helpful to the mother. He sets a good example of behavior for the younger children to follow. The mother has demonstrated good ability to care for her children since they have returned to her home. She has provided appropriate physical care for the children and the family relationships appear to be good. She has been able to use casework support appropriately and is providing a stable home for her children.

"I recommend that custody of Robert, Julia, Eugena, Willard, and Judy M. be terminated to their mother with whom they reside."

We are pleased to accept the recommendation of the caseworker who has rendered such valuable service to this family. That we arrived at this happy ending is not attributable to the unusual perspicacity of the court. Actually, the mother's care of the three eldest children made the outcome of this case easily predictable. While the "psychological parent theory" is not without merit, it had no application to the case *sub judice.* The too ready acceptance by the agency's caseworkers and clinicians of the proposition that the foster parents had become the "psychological parents" of Willard and Judy deterred the agency from providing the positive program of help and ser-

vices which was instituted upon the order of the court and which brought about the reunification of the family.

It is ordered by the court that the custody of the Cuyahoga County Welfare Department - Social Services of Robert, Julia, Eugena, Willard and Judy M. be terminated and that the aforesaid children be committed to the legal custody of their mother.

*Judgment accordingly.*