No. 84-220

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

IN THE MATTER OF C.A.R. and P.J.R.,
Youth in Need of Care.

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Diane G. Barz, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

W. Corbin Howard, Billings, Montana

For Respondent:

Harold Hanser, County Attorney, Billings, Montana
Greg Mullowney, Deputy County Attorney, Billings
Damon L. Gannett for Children, Billings, Montana

Submitted on Briefs: Sept. 6, 1984

Decided: December 20, 1984

Filed: DEC 20 1984

*Ethel M. Harrison*

Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court

This is an appeal from an order of the District Court of the Thirteenth Judicial District, Yellowstone County, Montana, the Honorable Diane G. Barz presiding, that awarded to the Department of Social and Rehabilitation Services custody of the youths C.A.R. and P.J.R. with the authority to assent to adoption.

There is one issue on appeal: whether the trial court abused its discretion in terminating M.R.'s rights as natural mother to C.A.R. and P.J.R. M.R. contended before the District Court that she had recovered from alcoholism and that the recovery signalled her general rehabilitation. This evidence of rehabilitation, she argued, reduced the probativeness of her past omissions and neglect, and mandated that the District Court award her custody. The District Court heard testimony from M.R. and various other witnesses and terminated the parental relationship. We affirm. There was substantial credible evidence supporting the District Court order.

The trail of events leading to this action began in March of 1978. The Yellowstone County office of the Montana Department of Social and Rehabilitation Services (SRS), has been assisting M.R., a single mother, since that time. SRS had received reports that her son C.A.R., less than one year old, was being neglected. A social worker found that the child was inadequately clothed and living in a dirty home with M.R. and his maternal grandmother, B.J.R. C.A.R. was not yet crawling, and the back of his head was flat, indicating that he was spending a great deal of time on his back and not being held or moved. He was listless and non-responsive to stimulation. M.R. did not appear

intoxicated at that time. The social worker offered M.R. the services of a SRS homemaker, and nursing and medical services. M.R. did not show much motivation to follow up with these services, or initiative in caring for her child.

On April 26, 1979, the social worker was notified that M.R. had left C.A.R. with a baby-sitter the day before, and had not returned for him. He was placed in an emergency foster care home, and the next day with his grandmother, B.J.R., after she contacted the social worker requesting custody. At that time, SRS sought and received Temporary Investigative Authority. C.A.R. was again placed in foster care in May, 1979, and from December 1979 until February 1980 because neither M.R. nor B.J.R. were able to care for the child. P.J.R. was born in 1980.

On May 19, 1981, another social worker placed C.A.R., then almost age four, and P.J.R., nine months, in emergency foster care after discovering the children unattended in M.R.'s home. P.J.R. was wet in a urine soaked crib and C.A.R. was playing in dog feces that was scattered about the floor of the apartment. The children were again placed with B.J.R. the next day at her request.

From December 1980 until October 1981, SRS attempted to provide M.R. with various community services, but she did not utilize them. After the children were returned in September 1981 to M.R. from the voluntary foster care placement, C.A.R. was enrolled in the Billings McKinley Preschool Early Childhood Intervention program to help him develop skills appropriate for a child his age. An examination by a team of professionals at the Development Assessment Clinic of the Montana Center for Handicapped Children had discovered significant developmental delays in C.A.R.

3

The youth missed school thirty-two times that fall and was terminated from the program for lack of attendance. The coordinator of the program talked to M.R. several times about this problem. M.R. explained that sometimes C.A.R. was ill and other times she was unable to wake up in time to ready C.A.R. to catch the noon bus across the street. The coordinator did not observe M.R. to be intoxicated during these conversations.

In November 1981, another social worker arranged appointments and transportation to take P.J.R. to Shodair Hospital in Helena for medical tests. Two appointments were made and cancelled after M.R. failed to awaken in time to prepare P.J.R. for the trip. When P.J.R. finally made it to Shodair, Dr. Opitz observed that she was very dirty and smelled of urine and that she was very passive and non-responsive during the examination. The back of her head also appeared flat.

In September of 1982, a teacher with the McKinley Preschool Program assisted M.R. with a simple stimulation program for P.J.R. after her pediatrician, Dr. Pat Sauer, had discovered significant developmental delays. M.R. showed little enthusiasm for the program. The teacher noticed no improvement in P.J.R.'s development while in M.R.'s custody, but noticed great improvement after the child was placed in foster care and the same program was implemented by the foster parents. A clinical psychologist also noted that P.J.R.'s mental functioning, developmental skills, and behavioral problems all improved substantially after the child had been under foster care for several months. Her IQ increased dramatically after being placed in foster care; a fact attributed to increased stimulation.

In October of 1982, the social worker placed both children in foster care after Dr. Sauer diagnosed P.J.R. as having suffered internal vaginal trauma, which apparently occurred while she was left with M.R.'s brother. M.R. explained that the trauma was accidental, due to P.J.R.'s falling down on a toy dump truck. Dr. Sauer's opinion was that the trauma was not accidental and that it was consistent with sexual abuse. On further questioning by Dr. Sauer, M.R. mentioned that a man named Donny, who had been staying with her brother, might be responsible for P.J.R.'s injuries P.J.R. was, at the time two years and two months old.

Treatment plans for M.R. were implemented several times. Prior to December, 1981, M.R. had agreed to a plan which required her to get C.A.R. to school every day, to bathe the children, to obtain toys and medical assistance for them, to keep the house clean, and to attend parenting class. M.R. failed to meet the conditions of the plan in any sufficient way. Another plan was agreed to by M.R. which additionally required her to locate suitable housing, to increase her employment skills, and to improve her parenting abilities. Again, she failed to meet the conditions of this plan. A third plan was adopted in November 1983, after the SRS had filed for termination of parental rights. The petition for termination was abated when M.R. agreed to this third plan. It required her to attend the Galen State Hospital Alcohol Rehabilitation program, and to attend Alcoholics Anonymous as part of her after-care treatment. It again required her to obtain housing, obtain a job or seek job skills, visit her children, and improve her parenting skills.

After completing the program at Galen State Hospital, M.R. moved to Missoula despite the social worker's request

that she come to Billings to be near her children. M.R. said she went to Missoula to be away from the social setting in Billings. She found a job there but after a few months moved back to Billings, losing her job in the process. At that time, the SRS reinstated its request for termination of M.R.'s parental rights.

At the date of the hearing, M.R. had successfully abstained from alcohol since leaving Galen State Hospital. She had found an apartment, but was unable to keep the children there, and had gone to work helping her mother do janitorial work at a bar in Billings. She presented evidence that corroborated the fact that she had abstained from alcohol since her release from Galen Hospital. She argued that this fact was sufficient evidence of rehabilitation so that she should be allowed another chance at caring for her children, and that she was ready to make a serious and sincere effort to do so.

Dr. Richard Agosto, a clinical psychologist in Billings, Montana, had examined M.R., P.J.R. and C.A.R. He and several social workers who had worked with M.R. concluded that alcohol was not the primary cause of her neglect of her children. They all felt that M.R. was using alcohol as an excuse for more fundamental problems. Her basic problem was a lack of motivation and maturity to appreciate and cope with the needs of her children. These problems were not likely to change in the foreseeable future, even with additional therapy. Dr. Agosto stated that if the children were returned to M.R. it was probable that her previous parenting patterns would be repeated. Dr. Agosto and the social workers agreed that M.R. had been given an adequate opportunity to parent her children, and failed to do so.

6

In regards to the children, Dr. Agosto, and the social workers all testified that mental and emotional harm would result if they were not provided with some stability, consistency, stimulation, proper parenting, and attention to their special needs. Dr. Agosto predicted that if the children were returned to the non-stimulating environment, that they could be expected to regress into their prior conditions. He concluded that the best interests of the children were that they not be returned to the custody of M.R.

This Court has reviewed similar district court determinations in the past. In In Re Gore (1977), 174 Mont. 321, 570 P.2d 1110, we discussed our role in this review:

> ". . . This Court is mindful that the primary duty of deciding the proper custody of children is the task of the district court. As a result, all reasonable presumptions as to the correctness of the determination by the district court will be made. Foss v. Leifer, ____ Mont. ____, 550 P.2d 1309, 33 St.Rep. 528 (1976). Due to this presumption of correctness, the district court's findings will not be disturbed unless there is a mistake of law or a finding of fact not supported by credible evidence that would amount to a clear abuse of discretion. Solie v. Solie, ____ Mont. ____, 561 P.2d 443, 34 St.Rep. 142 (1977)."

See also In the Matter of R.M.B. (Mont. 1984), 689 P.2d 281, 41 St.Rep. 1925; In the Matter of M.D.Y.R. (1978), 177 Mont. 521, 582 P.2d 758.

Section 41-3-101, MCA sets forth Montana's policy in regards to its youth. It states, in pertinent part:

> "(1) It is hereby declared to be the policy of the State of Montana to:
>
> "(a) insure that all youth are afforded an adequate physical and emotional environment to promote normal development; . . .

7

> "(2) It is the policy of this state to provide for the protection of children whose health and welfare are or may be adversely affected and further threatened by the conduct of those responsible for their care and protection. . . "

That statute also emphasizes that the needs of youth are presumably best met in a family environment, see also Santosky v. Kramer (1982), 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599. But when the rights of a youth to an adequate physical and emotional environment encounter demonstrated acts of commission or omission by the parents which deprive the youth of this environment, the best interest of the youth is paramount and takes precedence over parental rights or familial bonds. In Re Bad Yellow Hair (1973), 162 Mont. 107, 509 P.2d 9.

Before a court can award permanent custody of any child to SRS with a termination of parental rights, it must make findings in accordance with sections 41-3-406, 607 and 609, MCA. 41-3-609, MCA sets out the criteria that must be evaluated by the Court prior to ordering a termination, which in relevant part states:

> "41-3-609. Criteria for termination. (1) The court may order a termination of the parent-child legal relationship upon a finding that the circumstances contained in subsection (1)(a), (1)(b), or (1)(c), as follows, exists:
>
> ". . .
>
> "(1)(c) the child is an adjudicated youth in need of care and both of the following exist:
>
> "(i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful and;
>
> "(ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.
>
> "(2) In determining whether the conduct or condition of the parents is unlikely

8

to change within a reasonable time, the court must enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental care. In making such determinations, the court shall consider but is not limited to the following:

". . .

"(a) emotional illness, mental illness, or mental deficiency of the parent of such duration or nature as to render the parent unlikely to care for the ongoing physical, mental and emotional needs of the child within a reasonable time;

". . .

"(g) any reasonable efforts by protective service agencies that have been unable to rehabilitate the parent.

"(3) In considering any of the factors in subsection (2) in terminating the parent-child relationship, the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child. The court shall review and, if necessary, order an evaluation of the child's or the parent's physical, mental and emotional conditions."

Before parental rights may be terminated, the State must demonstrate by clear and convincing evidence that the statutory criteria has been met. Santosky v. Kramer, supra; In the Matter of T.J.D. (Mont. 1980), 615 P.2d 212, 37 St.Rep. 1385; In the Matter of J.L.B. (1979), 182 Mont. 100, 592 P.2d 1127.

With the requirements of section 41-3-609 in mind, we turn to the record. The first requirement is that the children are youth in need of care. The District Court held that C.A.R. and P.J.R. were, and this holding is supported by substantial credible evidence. A youth in need of care is one who is "dependent, abused, or neglected" 41-3-102(10), MCA. An abused or neglected child is ". . . a child whose

9

normal physical or mental health or welfare is harmed or threatened with harm by the acts or omissions of his parent or other person responsible for his welfare" 41-3-102(2), MCA. Harm to a child's health or welfare encompasses many aspects of the child's care and environment, and can result when a parent "inflicts or allows to be inflicted upon the child physical or mental injury" 41-3-102(3)(a), MCA. The type of inquiry contemplated by this part of the statue includes "the commission or omission of any act or acts which materially affects the normal physical or emotional development of a youth." In the Matter of M.R.L. (1980), 186 Mont. 468, 608 P.2d 134, and mental injury includes the identifiable and substantial impairment of a child's intellectual or psychological functioning," section 41-3-102(8), MCA.

M.R.'s failure to care and attend to C.A.R. and P.J.R. caused the physical problems such as excessive illness, flattened heads and uncharacteristic listlessness. The greatest injury to the children, though, was to their cognitive and emotional development. Dr. Agosto, Dr. Sauer and other experts all testified that the poor care the children were receiving had a detrimental effect on their development. When they were put in foster homes, they made remarkable progress, and appeared physically and emotionally happier. Dr. Agosto's opinion was that if the children were placed back in the care of M.R., they could be expected to regress.

The second statutorily defined area of harm to a child is when a parent "commits or allows to be committed a sexual assault against the child . . ." 41-3-102(3)(b). Dr. Sauer's examination of P.J.R. indicated that she had been sexually abused while in the care of M.R.'s brother. M.R.'s

10

explanation of the incident was clearly unsatisfactory. It was either an inexcusable attempt to protect someone who does not deserve protection, or to deny the obvious. The District Court was being charitable when it characterized M.R.'s explanation as "lame." We have considered similar situations before, and have no difficulty in considering this type of incident as evidence of neglect. In In the Matter of A.J.S. (Mont. 1981), 630 P.2d 217, 38 St.Rep. 947, we held:

> ". . . Regardless of any actual proof that a parent intentionally inflicted injuries upon his or her child, the occurrence of serious and frequent, yet unexplained, physical injuries to the child is sufficient to properly bring the child within the statutory definition." 630 P.2d at 221, 38 St.Rep. at 951.

We provided further guidance in this area of the law in the case of In the Matter of T.Y.K. (1979), 183 Mont. 91, 598 P.2d 593, when we stated:

> ". . . Section 41-3-101, et seq., Montana Code Annotated, grants to the District Court the ability to make a determination of neglect and abuse as to all children in a family based upon the policy that abuse of one child has a detrimental effect on the other children's development." 183 Mont. at 96, 598 P.2d at 596.

The third area of harm specifically listed in 41-3-102(3), MCA is in subsection (c), encompassing situations where the parent "causes failure to thrive or otherwise fails to supply the child with adequate food or fails to supply clothing, shelter, education or health care, though financially able to do so or offered financial or other reasonable means to do so." We have held that this provision "is broad enough to include emotional deprivation, inadequate nutrition, and extreme and prolonged uncleanliness of the child" In the Matter of A.J.S., 630 P.2d at 221, 38 St.Rep. at 950. The record is replete with instances of

11

inadequate hygiene, nutrition, inattention to offered financial and social support, educational needs, and so on. The District Court clearly had substantial evidence upon which it based its decision that the children were abused and neglected children.

The second requirement in 41-3-609, MCA is in subsection (1)(c)(i); that the parent had agreed to an approved treatment plan, but has failed to meet its conditions. Here, M.R. was given three opportunities, one in 1981, and two in 1983. Her failure to meet the provisions of the second plan brought about a prior termination proceeding which was abated pending the third plan. Her failure in the third plan brought about this action. This element was met.

The third requirement of 41-3-609, MCA, is in subsection (1)(c)(ii). The court must find that the conduct or condition of M.R. that renders her unfit is unlikely to change in a reasonable time. Stability is a very important factor in a child's development, and a child should not be subjected to constantly changing temporary foster care situations while waiting for their mother to possibly improve her parenting skills. In making this determination, the court may consider the nature of the deficiency that renders the parent unfit, 41-3-609(2)(a), MCA, and any reasonable efforts by protective agencies that have failed to bring about rehabilitation, 41-3-609(2)(g), MCA. Along with this finding, the court must also determine that the continuation of the parent-child relationship will result in continued abuse or neglect. Again the record is replete with evidence supporting the District Court's holding. Dr. Agosto, the examining psychiatrist, testified that M.R.'s basic problem was a lack of motivation towards her children, an inability to comprehend their needs, and a lack of depth of maturity to

bring about the needed change. He did not feel that M.R. was able to change significantly in the near future. Other social workers and experts testified to the same effect. None of them felt that alcohol was the particular problem with M.R., but rather that it was being used as a convenient excuse. A significant array of resources were enlisted to help M.R., but she showed little interest. And finally, all of those familiar with the children testified that they were in dire need of stability and proper care soon. Further care by M.R. was likely to negate any progress already made. The best interest of the children was for the parental relationship to be terminated.

M.R.'s sole argument on appeal is that the District Court failed to consider the evidence of her rehabilitation. M.R. contends that the District Court placed inordinate emphasis on past events, and insufficient emphasis on the fact that M.R. had abstained from drink for the year prior to the hearing.

First, we agree with M.R. when she argues that the purpose of termination actions is not merely to provide children with a "better life." It is, instead, designed to allow the State to step in only when it is apparent that the natural parent is failing, and is likely to continue to fail to provide the children with a minimally adequate life. If the children are being provided with the care and resources minimally adequate to their growth and development, the family is primary, and the State has no business in the matter. It is only when the child's care falls below that which is minimally adequate, that the State becomes interested as a protector of the child's welfare. See Santosky v. Kramer, supra.

13

Secondly, a termination proceeding must necessarily include a judgment about the ability of the parent to care for the child in the future. Regrettably, we do not have a crystal ball to look into to make this determination, so it must, to some extent, be based on a person's past conduct. We agree with M.R.'s assertion that evidence of rehabilitation is germane to this determination, but do not take it so far as to establish a rule that any evidence of rehabilitation renders the District Court powerless to find future danger to the children. It is evidence to be considered by the District Court, no more, no less, and is subject to the same standard of review as any other evidence.

M.R. cites several cases that support her argument that parental rights cannot be terminated in the face of credible evidence of rehabilitation. In In Re Welfare of A.R.W. (Minn. 1978), 268 N.W.2d 414, the Minnesota Supreme Court upheld a district court order returning the children to their natural mother from temporary foster care after it was shown that, over the course of six years she had been rehabilitated. In this case, M.R. had been under the observation of the SRS from 1978 until 1984, also a period of six years. Here, though, she did not show any progress until the very end of that time, and then under the threat of the previous termination petition. The district court's opinion that, "They've [the children] waited long enough." was justified.

M.R. also cites In Re M. (Ohio 1979), 416 N.E.2d 669, and State v. Pogue (Mo. 1955), 282 S.W.2d 582 for the proposition that changed circumstances mandate the children's return to the rehabilitated parent. In both these cases, the children were still in temporary foster care. The children were returned to their parents--just as C.A.R. and P.J.R.

14

were returned to M.R. on several occasions from 1978 to 1984. Here, the question the judge faced was the permanent termination of parental rights. The District Court's determination that M.R.'s conduct was unlikely to change significantly in the future was supported by substantial evidence, and was not an abuse of its discretion.

Affirmed.

_L. C. Gulbrandson_

Justice

We concur:

_Frank L. Haswell_

Chief Justice

_John Conway Harrison_

_Fred M. Morrison_

_John C. Sheehy_

Justices