No. 99-556

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 109N

IN THE MATTER OF

M.F., G.F., and H.F.,

Youths in Need of Care.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone,

The Honorable G. Todd Baugh, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Bruce J. Allison, Allison Law Office, Billings, Montana (Darlene Teran); Kevin Gillen, Gillen Law Office, Billings, Montana (Vincent Feeley); Patrick E. Keeney, Billings, Montana (Guardian ad Litem)

For Respondent:

Jospeh P. Mazurek, Montana Attorney General, Tammy K. Plubell, Assistant Montana Attorney General, Helena, Montana; Dennis Paxinos, Yellowstone County Attorney, Richard Helm, Deputy Yellowstone County Attorney, Billings, Montana; Roxanne Roller, Department of Public Health and Human Services, Billings

Submitted on Briefs: March 30, 2000

Decided: April 27, 2000

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent but shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number, and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.

¶2 Darlene T., the natural mother of M.F., G.F., and H.F., appeals an order of the District Court for the Thirteenth Judicial District, Yellowstone County, terminating her parental rights to all three children and awarding permanent custody of the children to the Montana Department of Public Health and Human Services (DPHHS). We affirm.

¶3 Vincent F., the natural father of the children, had his parental rights terminated earlier in the same proceedings by a separate order of the District Court. Vincent is not a party to this appeal.

¶4 We address the following issues on appeal:

¶5 1. Did the District Court abuse its discretion when it denied Darlene's motion to dismiss the youth-in-need-of-care action?

]¶6 2. Did the District Court abuse its discretion when it allowed DPHHS to introduce at a hearing on the termination of Darlene's parental rights, testimony regarding Vincent's abuse of his children and Darlene's failure to protect the children from that abuse even though Darlene and Vincent had divorced and Vincent had already relinquished his parental rights?

¶7 3. Did DPHHS prove by clear and convincing evidence that the youths were adjudicated as youths in need of care; that an appropriate treatment plan was developed for Darlene and approved by the court; that Darlene failed to comply with the treatment plan; and that the conduct or condition rendering Darlene unfit to parent her children was unlikely to change within a reasonable time?

## Factual and Procedural Background

¶8 On July 30, 1997, N.A., the 17-year-old daughter of Darlene, disclosed that Vincent, N. A.'s step-father, had been sexually abusing her since she was 11 years old. N.A. stated that she finally reported the abuse because she feared that Vincent would begin victimizing her younger half-sister, H.F., who was then 4 years old.

¶9 N.A. described incidents of her stepfather subjecting her to fondling of her breasts, digital penetration and oral sex. The sexual abuse occurred as frequently as four to five times a week. Vincent would either come into her room early in the mornings and awaken her, or he would come into the bathroom while she was in the tub. If she attempted to refuse, he would become angry or tell her that it would be her fault that he was in a bad mood and everyone would suffer. N.A. had told her mother about the abuse three years earlier, but when her mother confronted Vincent, he denied it, the matter was dropped, and the abuse continued.

¶10 N.A. was fearful of Vincent's reaction to her disclosure. She explained that he carried a gun and that he displayed it whenever there was a disagreement among the family. Vincent had also told N.A. that he might shoot someone or kill himself if she ever told about the abuse. N.A. feared that he might follow through on his threats. N.A. also reported that Vincent used drugs on a daily basis and that Vincent had forced her to smoke pot with him on at least one occasion.

¶11 DPHHS took N.A. into protective custody and placed her in the Youth Services Center in Billings. Vincent voluntarily moved out of the family home so that the younger three children could remain there with their mother. DPHHS filed a petition for temporary investigative authority and advised Darlene and Vincent that Vincent could not have any contact with the children without the approval of a social worker and that failure to comply with this condition would result in the younger three children being placed in foster care.

¶12 On August 1, 1997, Darlene and Vincent appeared at the Youth Services Center where N.A. was residing and demanded to speak with N.A. When the staff refused, Vincent became very angry and the police had to be called to remove him. Later that same day, Vincent returned to the Youth Services Center with H.F. and left a card for N.A. along with some of her things. The card encouraged N.A. to "withdraw" her report of sexual abuse and return home. Because of this message, the State charged Vincent with witness tampering and he ultimately pleaded guilty to that offense.

¶13 That same day, DPHHS placed four-year-old H.F., along with her two brothers, eight-year-old M.F. and six-year-old G.F., in foster care because it was evident from the fact that Vincent appeared at the Youth Services Center with H.F. that Darlene was allowing Vincent to have contact with the children. A few days later, social worker Rhonda Bodvig (Bodvig) met with Darlene. Darlene admitted to Bodvig that she allowed Vincent to have contact with the children, despite the strong warning from DPHHS that the children would be removed from her care if she did so, because Vincent had control over her and could get her to do things against her better judgment.

¶14 Vincent was arrested on the sexual abuse charge on August 22, 1997. The following week, the District Court conducted a show cause hearing at the conclusion of which the court granted temporary investigative authority to DPHHS for 90 days. After the hearing, social worker Roxanne Roller (Roller) developed treatment plans for both Darlene and Vincent to be completed during the 90-day period. The court approved the treatment plans on September 15, 1997.

¶15 Vincent's treatment plan consisted of completing a chemical dependency evaluation and refraining from having any contact with the children, including telephone calls and leaving messages on the answering machine, unless supervised by a social worker. Darlene's treatment plan consisted of completing psychological and chemical dependency evaluations, participating in a support group for domestic violence victims and in parenting classes, and refraining from allowing Vincent to have any contact with the children.

¶16 Roller met with Darlene on August 26, 1997. Roller later reported that during this conversation, Darlene was unable to make a verbal commitment to her children. Darlene stated that she did not think N.A. would lie about the sexual abuse, but she did not know who to believe because Vincent had assured her that it had not happened.

¶17 Darlene had a supervised visit with her children on August 29, 1997. During that visit, it was N.A. that the children listened to when they acted out, not Darlene. Darlene had difficulty controlling the children's behavior. Moreover, Darlene upset the children when she informed them that she was selling some of the family's possessions because she needed money.

¶18 On October 14, 1997, Roller visited Vincent in the Yellowstone County Jail where he was being held on the charges of incest and witness tampering. Vincent had sent Roller a letter stating that he would not sign his treatment plan, thus Roller went to see him to discuss DPHHS's involvement, the treatment plan, and how his parental rights could be lost if he did not comply. Roller said Vincent was hostile, angry and unwilling to work with DPHHS.

¶19 On October 24, 1997, DPHHS filed a Petition for Temporary Custody because neither Vincent nor Darlene had completed significant portions of their treatment plans. Vincent and Darlene did not oppose the petition. Consequently, the District Court adjudicated H. F., M.F., and G.F. as youths in need of care and awarded DPHHS legal custody of the children for six months.

¶20 Sometime thereafter, Georgia Franko (Franko), a licensed clinical social worker and private therapist, began counseling sessions with M.F. and G.F. Both M.F. and G.F. suffered from major depression and had to take anti-depressants. In addition, M.F. did not like being in foster care and was exhibiting some behavioral problems. Franko's initial sessions with the boys were to help them cope with their placement in foster care. However, as the counseling progressed, G.F. disclosed that Vincent had hit him with a board and that he did not feel safe at home and did not want to return there.

¶21 N.A. moved from the youth shelter to a foster home on December 4, 1997. The next day, she recanted the sexual abuse allegations. She tearfully reported to the social worker that although Vincent had in fact sexually abused her, she recanted because she wanted to go home. Based on N.A.'s recantation, the sexual abuse charges against Vincent were dismissed. N.A. returned to live with her mother on December 17, 1997.

¶22 The following week, on Christmas eve, DPHHS returned H.F., G.F. and M.F. to Darlene's care with the understanding that she would not allow any contact between the children and Vincent. However, when a social worker initiated a telephone conversation between Darlene and Vincent at his request because he wanted to speak with Darlene

about retrieving some of his personal belongings, Darlene gave Vincent her new telephone number.

¶23 On January 7, 1998, Vincent was released from the Yellowstone County Detention Facility after pleading guilty to felony tampering with a witness. He was eventually given a three-year deferred imposition of sentence on this charge. Immediately upon his release, Vincent went to Darlene's house, but she and the children were not home. The police had to be called to remove him.

¶24 After Vincent's release, Roller suspected that he was once again having contact with the children, thus, she interviewed H.F. and G.F. independently at their school. Both children informed Roller that Vincent was living with them. Darlene, however, denied this. She stated that Vincent had only stopped by a couple of times, but she promised not to let him come around any more. She also promised to get a temporary restraining order against Vincent, but she failed to do so. Darlene eventually admitted to Jackie Lynn Garcia (Garcia), a domestic violence group facilitator, that Vincent was living in the home.

¶25 DPHHS removed M.F., G.F., and H.F. from Darlene's home for the second time on January 20, 1998. The children had been home for less than a month.

¶26 About this same time, Roller made several observations--Vincent and Darlene shopping together and Vincent driving Darlene's car--that suggested to Roller that Vincent and Darlene were still together. More significantly, neither Darlene nor Vincent were making meaningful progress on their treatment plans.

¶27 Vincent's and Darlene's supervised visits with the children were causing the children great confusion because while Roller was telling the children that their parents had certain things they had to complete before the children could return home, Vincent and Darlene were promising them that they would be coming home in a few days. Vincent's supervised visits with the children were discontinued on March 23, 1998, due to his behavior during the visits --arguing with the social worker and making empty promises to the children.

¶28 During the initial six-month period of DPHHS's temporary legal custody, M.F.'s emotional state deteriorated and he exhibited aggressive and violent behavior toward other children, especially his siblings. On March 23, 1998, Roller met with M.F. at his school. M.F. cried and explained that he could not understand why his mom and dad did not do what they needed to do so that he and his siblings could return home. M.F. was frustrated

that his parents continually lied to him about this.

¶29 In April 1998, Roller had a lengthy discussion with Darlene about whether she intended to maintain her relationship with Vincent. Darlene admitted that she had regular contact with Vincent, but that they were not planning on reuniting. Roller explained that if Darlene intended to maintain the relationship, then not only would Darlene have to successfully complete her treatment plan, but Vincent would have to complete his as well.

¶30 On April 8, 1998, Roller met once again with Darlene. Darlene reported that she and Vincent were fighting a great deal of the time. Roller offered Darlene the opportunity to return to Texas, where her extended family lives, with the children. Roller told Darlene that she would request funding for transportation for Darlene and the children and she would request that Texas provide services to them. Darlene declined the offer explaining that N.A. did not want to leave the Billings area.

¶31 On May 1, 1998, Roller discussed with Darlene the possibility of Darlene going to Gateway House, a shelter for battered women and children. Roller told Darlene that if she was living at the shelter, the children could be returned to her care. Darlene refused to go.

Roller again explained to Darlene that by choosing to remain with Vincent, her ability to have the children returned to her care was not only dependent upon her completion of her treatment plan, but Vincent's successful completion of his treatment plan. Darlene told Roller she understood, but that she was willing to take that chance.

¶32 On June 8, 1998, N.A. called Roller and reported that Vincent was at their home and that he and Darlene were arguing. N.A. said that Vincent hit Darlene with the spark-plug wire he had taken off of her car to prevent her from leaving. N.A. also stated that Vincent was hitting Darlene with his hands.

¶33 On June 12, 1998, Roller informed Darlene that the children's counselor would like to begin family therapy sessions with Darlene and the children. Darlene was to call the counselor to set up these sessions, but Darlene failed to do so. On June 29, 1998, based on the stipulation of all the parties, the court extended DPHHS's temporary legal custody of M.F., G.F., and H.F. for an additional six months.

¶34 In July 1998, all of the parties and their respective counsel had a meeting with Mike Sullivan (Sullivan), a licensed clinical social worker, who had completed a psycho-sexual

evaluation of Vincent. Sullivan stated that Vincent needed out-patient sexual offender treatment and that Darlene needed to participate in the support group for spouses of sexual offenders. Vincent argued that since N.A. had recanted and the sexual abuse charges against him had been dismissed, he was not in need of treatment and that DPHHS should return the children to him and Darlene. Nevertheless, at the conclusion of the meeting, both Vincent and Darlene agreed to participate in the treatment programs outlined by Sullivan.

¶35 Despite their earlier agreement to participate, neither Vincent nor Darlene attended their scheduled appointments. Ultimately, Sullivan declined to work with either of them based on their attitudes and their failure to attend their scheduled appointments. In September 1998, Sullivan also declined Darlene's request to attend the spouses' support group because he was of the opinion that it would be meaningless since she was still living with Vincent and Vincent was without any form of treatment.

¶36 Vincent and Darlene divorced in the summer of 1998, but they continued to live together. Darlene later explained that she divorced Vincent because she thought it would help her get her children back.

¶37 In August or September 1998, M.F. and G.F. disclosed for the first time that Vincent physically abused them. The boys reported being beaten with a broken piece of wood and a brown belt with studs in it. M.F. reported that Vincent left marks on both boys and that their mother knew Vincent was hitting them, but if she tried to stop it, Vincent would shut the door in her face. M.F. also talked about Vincent's threats to cut off M.F.'s private parts.

¶38 By October 1998, neither Darlene nor Vincent had successfully completed their treatment plans. Although Darlene had attended parenting classes and was attending the support group for victims of domestic violence, she had not participated in any individual or family counseling. On October 9, 1998, Roller met with Darlene to inform her of DPHHS's intention to file for permanent custody of the children. Darlene acknowledged that she and Vincent were still living together.

¶39 Darlene's visits with the children were becoming increasingly traumatic for them. M.F.'s level of aggression increased after every visit and G.F. cried uncontrollably before the visits stating that he did not want to go. And, despite her knowledge that DPHHS intended to seek permanent custody of the children, Darlene continued to promise the children that they would be coming home soon. Hence, Darlene's visits were reduced to only twice a

month.

¶40 On October 29, 1998, DPHHS filed a petition to terminate Vincent's and Darlene's parental rights to H.F., G.F., and M.F. In December 1998, prior to a hearing on the matter, Darlene finally applied for a restraining order against Vincent. In the application for the restraining order, Darlene admitted for the first time that Vincent physically abused her, that he had threatened to kill her, and that Vincent sexually abused N.A.

¶41 On February 8, 1999, March 1, 1999, March 15, 1999, and May 3, 1999, the court conducted hearings on the permanent custody of the children. At the beginning of the March 1, 1999 hearing, Vincent filed an affidavit relinquishing his parental rights to H.F., M.F., and G.F. After the court accepted Vincent's relinquishment, Darlene's counsel moved to have the youth-in-need-of-care action dismissed and to have the children returned to Darlene's care. DPHHS and the children's guardian ad litem objected and the court denied the motion.

¶42 During Roller's testimony at the March 15, 1999 hearing, Darlene's counsel objected to the admission of evidence concerning Vincent's abusive acts arguing that such evidence was not relevant to the permanent custody proceeding. Counsel for DPHHS responded that Vincent's behavior directly reflected on Darlene because she supported or at least acknowledged everything Vincent had done. The District Court overruled the objection.

¶43 At the time of the permanent custody hearings, G.F.'s and M.F.'s counselor informed the court that, after almost two years in foster care, termination of Darlene's parental rights was in the children's best interest as they needed a stable, permanent home. Furthermore, G.F. did not want to return home because he did not feel safe there and did not believe that his mother could protect him. M.F., on the other hand, expressed a desire to return home stating that he would be all right because he was bigger now and could protect himself and his mother from Vincent.

¶44 Roller testified at the hearings that she had repeatedly emphasized to Darlene the purpose of the treatment plans and how important it was for Darlene to complete her treatment objectives. Roller further testified that she had explained to Darlene several times that failure to successfully complete the treatment objectives could result in the termination of her parental rights.

¶45 The court approved the fourth and last treatment plan for Darlene on September 28,

1998. In addition to maintaining a safe home for the children, this plan required Darlene to participate in individual counseling sessions and follow through with all recommendations of her counselor, participate in a support group for spouses of sexual offenders, and participate in family therapy sessions when deemed appropriate by the children's therapist. Darlene did not complete any of these objectives. Although she had been attending a support group for victims of domestic violence, it was determined that that was not a sufficient substitute for individual therapy.

¶46 By the time of the permanent custody proceedings, DPHHS had successfully placed H. F., G.F., and M.F. with their maternal aunt and uncle in Texas. Both H.F. and G.F. were doing well in school. M.F.'s behavior was also improving. He was no longer physically aggressive with his siblings and his school performance had improved. However, M.F. was concerned about who would protect his mother from his father if M.F. was not in the home.

¶47 The children's aunt and uncle were willing to adopt all three children and were amenable to allowing the children to have contact with Darlene as long as she was not maintaining a relationship with Vincent or a man like him. On June 10, 1999, the District Court entered its findings of fact, conclusions of law and judgment wherein the court determined that Darlene's parental rights to H.F., G.F., and M.F. should be terminated and permanent custody of the children awarded to DPHHS with the right to consent to a future adoption. Darlene appeals the judgment of the District Court terminating her parental rights.

### Standard of Review

¶48 We review a district court's conclusions of law to determine whether the court interpreted the law correctly. *In re M.A.E.*, 1999 MT 341, ¶ 17, 297 Mont. 434, ¶ 17, 991 P.2d 972, ¶ 17 (citing *In re J.N.*, 1999 MT 64, ¶ 11, 293 Mont. 524, ¶ 11, 977 P.2d 317, ¶ 11). We review a court's findings of fact to determine whether those findings are clearly erroneous. *M.A.E.*, ¶ 17. A finding of fact is clearly erroneous if it is not supported by substantial evidence; if the district court misapprehended the effect of the evidence; or, if after reviewing the record, we are left with a definite and firm conviction that a mistake has been made. *M.A.E.*, ¶ 17.

¶49 Moreover, a natural parent's right to the care and custody of a child is a fundamental liberty interest which must be protected by fundamentally fair procedures. *M.A.E.*, ¶ 18

(citations omitted). Thus, a district court must adequately address each applicable statutory requirement before terminating an individual's parental rights. *M.A.E.*, ¶ 18. The party seeking to terminate an individual's parental rights has the burden of proving by clear and convincing evidence that the statutory criteria for termination have been met. *M.A.E.*, ¶ 18. In addition, when considering the criteria for termination, courts must give primary consideration to the best interests of the child as demonstrated by the child's physical, mental, and emotional conditions and needs. *J.N.*, ¶ 13 (citing § 41-3-609(3), MCA).

## Issue 1.

¶50 *Did the District Court abuse its discretion when it denied Darlene's motion to dismiss the youth-in-need-of-care action?*

¶51 Darlene contends that once Vincent relinquished his parental rights to the children, they were no longer in danger of being abused or neglected. Hence, Darlene maintains that the District Court should have returned the children to her care and dismissed the youth-in- need-of-care action.

¶52 Darlene's argument ignores the dynamics of the family environment which led to the abuse and neglect proceedings in the first place. Darlene fails to recognize that Vincent's control over her and her continuing contact with Vincent put the children at risk. It is Darlene's inability to protect her children and provide a safe environment for them that is in question. When given the opportunity to be reunited with her children in her own home, Darlene allowed Vincent to have contact with the children. When given the opportunity to be reunited with the children in a safe environment, such as her extended family in Texas or a local shelter, she declined. When confronted head-on with the reality that maintaining her relationship with Vincent could mean permanently losing her children, she chose Vincent.

¶53 Moreover, Darlene cites no authority in support of her position. Rule 23(a)(4), M.R. App.P., requires the appellant to cite to authority which supports the position being advanced on appeal. *Rieman v. Anderson* (1997), 282 Mont. 139, 147, 935 P.2d 1122, 1126-27. Thus, it is the appellant that carries the burden of establishing error by the trial court. It is not this Court's job to conduct legal research or develop legal analysis on the appellant's behalf. *Johansen v. State Dept. of Natural Resources*, 1998 MT 51, ¶ 24, 288 Mont. 39, ¶ 24, 955 P.2d 653, ¶ 24 (citing *State v. Carter* (1997), 285 Mont. 449, 461, 948 P.2d 1173, 1180; *State v. Fina* (1995), 273 Mont. 171, 181, 183, 902 P.2d 30, 36, 38).

¶54 Darlene failed to establish any error by the District Court in denying her motion to dismiss the youth-in-need-of-care action. Therefore, we conclude that the District Court did not abuse its discretion when it denied her motion.

## Issue 2.

¶55 *Did the District Court abuse its discretion when it allowed DPHHS to introduce at a hearing on the termination of Darlene's parental rights, testimony regarding Vincent's abuse of his children and Darlene's failure to protect the children from that abuse even though Darlene and Vincent had divorced and Vincent had already relinquished his parental rights?*

¶56 Rule 402, M.R.Evid., states in part: "Evidence which is not relevant is not admissible." Rule 401, M.R.Evid., defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

¶57 The past history of the case suggests that despite Vincent's relinquishment of his parental rights, Darlene would continue to have contact with Vincent. Through the duration of the youth-in-need-of-care action, Darlene maintained her relationship with Vincent. Darlene knew that such contact with Vincent would jeopardize her custody of the children, yet she continued to have contact with him even after their divorce.

¶58 Vincent's sexual and physical abuse of the children and Darlene's unwillingness or inability to protect the children from that abuse were wholly relevant to this case. Darlene's continuation of her relationship with Vincent, despite his unwillingness to complete his treatment plan, was relevant to whether there was a stable and safe home for the children if they were to be returned to Darlene.

¶59 Accordingly, we hold that the District Court did not abuse its discretion when it allowed DPHHS to introduce testimony regarding Vincent's abuse of his children at a hearing on the termination of Darlene's parental rights, even though Darlene and Vincent had divorced and Vincent had already relinquished his parental rights.

## Issue 3.

¶60 *Did DPHHS prove by clear and convincing evidence that the youths were adjudicated*

*as youths in need of care; that an appropriate treatment plan was developed for Darlene and approved by the court; that Darlene failed to comply with the treatment plan; and that the conduct or condition rendering Darlene unfit to parent her children was unlikely to change within a reasonable time?*

¶61 The State petitioned to terminate Darlene's parental rights as to M.F., G.F. and H.F. pursuant to § 41-3-609(1)(e), MCA (1997), the statute in effect at that time. This statute required that the children be adjudicated youths in need of care and that both of the following conditions exist:

> (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and

> (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time; . . .

¶62 Darlene does not dispute that the children had been adjudicated youths in need of care or that she did not complete all of the items in her treatment plan. Darlene does, however, dispute the District Court's conclusion that her conduct or condition rendering her unfit is unlikely to change within a reasonable time. Darlene points out that, contrary to the District Court's conclusion, she divorced Vincent in the summer of 1998, and in December 1998, she obtained a protective order to restrain Vincent from contacting her. In addition, Darlene had been consistently attending a battered women's support group since August 1997.

¶63 Darlene argues that while there were continuing contacts between Darlene and Vincent, these contacts did not violate her treatment plans. All four of Darlene's treatment plans prohibited Darlene from allowing any known or suspected sex offenders from having contact with the children. They did not specify that *Darlene* could not have contact with Vincent. Some of the alleged violations, Vincent and Darlene shopping together at Walmart and Vincent driving Darlene's car, occurred while the children were in foster care. Moreover, Darlene notes that her last treatment plan expired on December 31, 1998, so any contact with Vincent after that could not be a violation since no treatment plan was in effect.

¶64 Darlene incorrectly likens her circumstances to those addressed by this Court in *In re J.A.B.*, 1999 MT 173, 295 Mont. 227, 983 P.2d 387. In *J.A.B.*, the sole reason for the termination of the mother's parental rights was the court's conclusion that the mother had

contact with her boyfriend, who was responsible for the death of her first child, and thereby failed to complete her treatment plan. *J.A.B.*, ¶ 17. We overruled the District Court in that case because at the time the contact occurred, no treatment plan was in place. In the case *sub judice*, the District Court did not terminate Darlene's parental rights because she had contact with Vincent. It terminated her parental rights because of her failure to protect her children from Vincent and her failure to complete significant portions of her treatment plan, such as attending both individual and family counseling.

¶65 Partial compliance with a treatment plan is insufficient to preclude termination of parental rights. *In re K.A.B.*, 1999 MT 71, ¶ 19, 294 Mont. 29, ¶ 19, 977 P.2d 997, ¶ 19 (citations omitted). We have further stated that "a parent must not only comply with the treatment plan, but the treatment plan must be successful." *In re E.W.,* 1998 MT 135*, ¶ 26,* 289 Mont. 190, ¶ 26, 959 P.2d 951, ¶ 26 (citations omitted). And, "it is well established that a treatment plan can be unsuccessful even when the tasks were completed." *In re S. M.*, 1999 MT 36, ¶ 25, 293 Mont. 294, ¶ 25, 975 P.2d 334, ¶ 25 (citations omitted).

¶66 Moreover, a finding of whether the conduct or condition rendering a person unfit to parent is unlikely to change within a reasonable time "requires the court to assess the past and present conduct of the parent." *M.A.E.*, ¶ 37. "[W]e do not have a crystal ball to look into to make this determination, so it must, to some extent, be based on a person's past conduct." *M.A.E.*, ¶ 37 (quoting *In re C.A.R.* (1984), 214 Mont. 174, 187, 693 P.2d 1214, 1221).

¶67 In its June 7, 1999 order terminating Darlene's parental rights, the District Court noted that the youth-in-need-of-care action had been pending for almost two years and that for most of that time, Darlene chose to continue her relationship with Vincent rather than make meaningful progress on her treatment plan. In its Finding of Fact number 55, the court specifically found:

> Darlene was offered four treatment plans in this case. These treatment plans were all approved by the Court as being appropriate to meet the needs of this family. The goals of these treatment plans were to enable Darlene to develop an awareness of the risk Vincent posed to the children, to address this risk, to put the children and their safety first, to achieve and maintain a stable environment, to improve her mental health status, to address and overcome her co-dependency issues, to enable her to protect her children, and to develop minimally adequate parenting skills. None of these goals were successfully met. The tasks required of Darlene by the

treatment plans that were not successfully done included: maintaining a safe home, not allowing the children unauthorized contact with Vincent, individual counseling, attendance at a support group for spouses of sexual offenders, and family therapy.

¶68 Darlene knew in October 1998, of DPHHS's intention to file for permanent custody. Yet, from that time until May 1999, when the termination hearings were completed, Darlene declined to make efforts to complete critical components of her treatment plan. For example, on the last day of the termination hearings, Darlene had yet to find a therapist for individual counseling sessions.

¶69 As the children's counselor informed the court at the time of the termination hearings, after almost two years in foster care, the children needed a permanent, safe, and stable home. When the right of a youth to an adequate physical and emotional environment encounters demonstrated acts of commission or omission on the part of the natural parent to provide such an environment, the rights of the youth are paramount and must take precedence over the desires of the parent. *In re Gore* (1977), 174 Mont. 321, 328-29, 570 P.2d 1110, 1114.

¶70 Accordingly, we hold that the District Court correctly concluded that the conduct or condition rendering Darlene unfit as a parent was unlikely to change within a reasonable time.

¶71 Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ WILLIAM E. HUNT, SR.

/S/ KARLA M. GRAY

/S/ TERRY N. TRIEWEILER

/S/ W. WILLIAM LEAPHART