No. 88-614

IN THE SUPREME COURT OF THE STATE OF MONTANA

1989

IN RE THE MATTER OF
R.T.L.P., Youth in Need of Care.

APPEAL FROM:  District Court of the Thirteenth Judicial District,
              In and for the County of Yellowstone,
              The Honorable Diane G Barz, Presiding Judge.

COUNSEL OF RECORD:

        For Appellant:

            Sally M. Johnson, Billings, Montana

        For Respondent:

            Hon. Marc Racicot, Attorney General, Helena, Montana
            Dorothy McCarter, Asst. Atty. General, Helena
            Harold Hanser, County Attorney; Greg Mullowney, Deputy,
            Billings, Montana
            Damon Gannett; Olsen, Christensen & Gannett, Billings,
            Montana
            Camille Ventrell; Davidson & Poppler, Billings, Montana

                                Submitted on Briefs:  May 25, 1989

                                    Decided:  August 11, 1989

Filed:

                                _____
                                          Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

This is an appeal from a ruling of the District Court of the Thirteenth Judicial District, Yellowstone County, granting long-term custody of R.T.L.P. to his natural grandmother and her husband. Mother appeals. We affirm.

The issues presented for our review are:

1. Did the District Court err in determining that R.T.L.P. was a "youth in need of care?"

2. Is the granting of long-term custody until age 18 the equivalent of a termination of parental rights, requiring that the statutory factors of termination be established?

3. Was the mother constitutionally entitled to effective assistance of counsel?

R.T.L.P. was born in Montana on February 5, 1983. The family moved to Wisconsin where they resided until 1984. In 1984 R.T.L.P.'s mother and father separated and the state of Wisconsin began an investigation into the family situation. In violation of a Wisconsin court order, mother moved to Missoula, Montana on August 15, 1984, with R.T.L.P. and his baby sister. At that time R.T.L.P. was seventeen months old and the sister was two months old. Mother claims she left Wisconsin because she was afraid of physical harm from her husband. Upon arrival in Montana, mother and her children moved in with the maternal grandmother and her husband.

Upon their arrival, the grandmother immediately noticed that the 2 month old baby appeared very sick and that the infant had a burn on her body. Grandmother made an appointment with a doctor and both the grandmother and the mother took the baby to the doctor on August 17, 1984. The baby was diagnosed as a "failure to thrive" baby and a letter from the doctor began by stating: "To Whom it May Concern: This child suffered from severe malnutrition." Efforts to feed

2

the infant resulted in a perforated bowel. On August 20 the infant was flown to Salt Lake City, Utah for further medical care, but the infant died on August 31, 1984. While the cause of death was listed as septicemia with meningitis, reports from both the Missoula doctors and the Salt Lake City doctors revealed that the infant was in a very weakened physical condition.

The grandmother testified that for the few days in which she observed the mother care for the child, the mother was feeding the infant diluted formula, and also that she allowed the infant to cry all night rather than feeding her. She testified that the mother never held or cuddled the baby.

After the funeral of the baby sister, R.T.L.P. spent five weeks with an aunt who lived in Idaho. Mother made no contact with R.T.L.P. during this time.

The state of Wisconsin continued its involvement with the family, culminating in an award of temporary custody of R.T.L.P. to the grandmother. Mother agreed to this custody arrangement. R.T.L.P. and his mother resided with the maternal grandparents from August 1984 until October 1986. During this time the grandparents took care of R.T.L.P. Mother would occasionally leave the home for periods of up to 4 to 6 weeks at a time, and during these absences she maintained little or no contact with her son. When the grandparents moved to Billings mother and R.T.L.P. moved with them.

In May 1986, mother moved out of the grandparents' home and moved in with a man whom she later married. R.T.L.P. remained with his grandparents who assumed his total care. After this, mother visited her son only every 10 days to two weeks.

In October of 1986, mother and her boyfriend asked the grandparents if they could pick up R.T.L.P. and take him out to get pizza that evening. The grandparents agreed to this

3

and R.T.L.P. left with his mother and her friend. When the child was not returned, the grandparents contacted the police. The State of Montana obtained temporary investigative authority, and it was determined that mother and her boyfriend had taken R.T.L.P. to California, where they were residing with the boyfriend's parents. On November 7, 1986, pursuant to an order granting the State of Montana temporary custody of R.T.L.P., the child was returned to Montana.

A guardian ad litem was appointed for R.T.L.P., and on December 4, 1986, a hearing was held in Montana to determine the custody of R.T.L.P. At the close of the hearing, the court ordered that R.T.L.P. be placed in the temporary custody of Social Rehabilitation Services (SRS) for six months. R.T.L.P. resided with foster parents in their home. Temporary custody was extended twice and in April of 1988 the grandparents made a motion to obtain custody of R.L.T.P. As a result of the hearing on this motion, held May 31 and June 1, 1988, the court granted long-term custody of R.T.L.P. until age 18 to the natural grandmother and her husband. Mother appeals. We affirm.

I

Did the District Court err in determining R.T.L.P. to be a youth in need of care?

In reviewing a custody order by the District Court we have previously stated:

> [T]his Court is mindful that the primary duty of deciding the proper custody of children is the task of the district court. As a result, all reasonable presumptions as to the correctness of the determination by the district court will be made. Due to this presumption of correctness, the district court's findings will not be disturbed unless there is a mistake of law or a finding of fact not supported by credible evidence that would amount to a clear abuse of discretion. (Citation ommitted.)

4

Matter of C.G. (Mont. 1988), 747 P.2d 1369, 1371, 45 St.Rep. 63, 66.

Before the State may become involved in the custody of a youth, the youth must be adjudicated a "youth in need of care", which, pursuant to § 41-3-102(11), means a youth who is "dependent, abused or neglected." An abused or neglected child is further defined in § 41-3-102(2) as "a child whose normal physical or mental health or welfare is harmed or threatened with harm by the acts or omissions of his parent or other person responsible for his welfare." In the present case the District Court determined that R.T.L.P. was a youth in need of care, in that he had been "physically abused, emotionally abused and emotionally neglected." Our review of the record reveals ample evidence to support this finding.

The mother voluntarily left R.T.L.P. in the care of her mother and stepfather for two years. During this time, the grandmother assumed responsibility for the child's physical and emotional needs. The evidence showed that mother often left home for days and weeks, without maintaining contact with him. R.T.L.P. called the grandmother "Mamma," and he called his mother by her given name. In fact, grandmother testified that at times the mother directed her son not to call her "Mamma," telling him that the grandmother was his "Mamma."

The mother and her boyfriend testified that they took R.T.L.P. to California because they wanted to get married and "be a family." However, the testimony elicited from them on cross-examination showed that they never considered the impact of that decision on R.T.L.P. Reports from social workers showed that after this event the youth had nightmares and was fearful of being taken from his grandparents again.

When R.T.L.P. was returned to Montana, the mother and her boyfriend also returned and were married. Neither became

5

employed.   Mother then began a Service Treatment Program through SRS designed to help her with parenting abilities. Although she was somewhat cooperative in this plan, she missed many appointments.   During this time she and her new husband had visits with R.T.L.P. two times per week.   After several of these visits. R.T.L.P. was returned to the grandparents with indications of physical abuse, including a swollen mouth, swollen lip, black eye, chipped tooth, and back and abdominal pain.

The court heard testimony from a licensed clinical psychologist.   The psychologist determined that mother was capable of parenting.   However, he also noted that he only saw her twelve times during a period of two and one half months, and based his evaluation solely on mother's statements to him.   He acknowledged that he might change his evaluation if her statements were incorrect.   He diagnosed two disorders in the mother:   post-traumatic stress disorder and dependent personality disorder.

The social worker saw mother and R.T.L.P. for a year and a half, from October 1986 to April 1988.   His testimony emphasized that the child has shown a lack of ability to bond with his mother, but that there is a strong bond with the grandmother.   He stated that irreparable damage had been done in regard to R.T.L.P.'s ability to bond with his mother.   He testified that the youth was emotionally healthy at the time of the hearing, but that this was a result of being in the grandparents' care.   He expressed serious concern about R.T.L.P.'s physical and emotional welfare should he be placed in the custody of mother and her new husband.   His recommendation was that R.T.L.P. remain in the grandparents' care.

The District Court found that mother was unstable and totally lacked credibility.   The record supports this finding.   Mother gave two different stories as to the origin of

6

the burn on the infant daughter who died. In 1984 she first reported that at a women's shelter in Wisconsin another mother had put Crisco on the baby and left her laying in the sun. At the custody hearing mother testified that her former husband and his friends had broken into the women's shelter, tied her to a chair, and gang raped her. She stated they had put Crisco on the infant and put her under a heat lamp, resulting in the infant's burn.

Mother's sister testified that for many years mother had accused various people, including family members, of sexual abuse. She stated that none of these allegations had ever been proven to be true. She also testified to personal knowledge of mother's past drug abuse, including the use of cocaine and heroine during her pregnancies. She testified that she had seen mother chase R.T.L.P. with a vacuum hose, even though the child was terrified of loud noises.

Mother contends that the District Court merely considered the child's best interests in awarding custody, and did not first establish that R.T.L.P. was a youth in need of care. Mother is correct in urging that an initial finding of abuse, neglect or dependency is the "jurisdictional prerequisite for any court ordered transfer of custody," and only after this showing has been made is the best interests test relevant. Matter of M.G.M. (1982), 201 Mont. 400, 407, 654 P.2d 994, 998. However, our review of the record reveals ample evidence to support the District Court's finding that R.T.L.P. was physically abused, emotionally abused, neglected, and therefore a youth in need of care.

For four years mother's actions were marked by indifference to and neglect of her parental responsibilities. She did not assume the physical care of her son, and was insensitive to her son's emotional needs. Additionally, the District Court gave serious consideration to the circumstances

surrounding the death of R.T.L.P.'s infant sister, which strongly suggested mother's neglect of that child also. These facts are certainly relevant to mother's ability to parent.

The record demonstrates that mother has not been an adequate parent and that there is substantial potential for harm to R.T.L.P. should he be placed in mother's care. While mother states that she would provide a good home at this point, her past actions and her present instability and lack of credibility are not persuasive. R.T.L.P. does not need to wait longer for mother to improve her parenting skills. Matter of C.A.R. (1984), 214 Mont. 174, 188, 693 P.2d 1214, 1222. We conclude that R.T.L.P. is a youth in need of care whose best interests are served by remaining in the custody of the grandparents. We therefore affirm the District Court.

## II

Is the granting of long-term custody until age 18 the equivalent of a termination of parental rights, requiring that the statutory factors of parental termination be met?

The court's order awarded custody of R.T.L.P. to his grandparents until he reaches age 18. The grandparents have the right to make decisions regarding the youth's medical, educational, and legal needs. Further, the order states that the mother's visitation rights shall be restricted and supervised. Mother is allowed visitation only twice a month for one hour at the Montana Department of Family Services. Mother contends that this equates with parental termination and that therefore the factors of § 41-3-609, MCA, must be fulfilled.

The court granted long-term custody pursuant to § 41-3-406, MCA, which states in pertinent part:

> If a youth is found to be abused, neglected or
> dependent under 41-3-404, the court after the
> dispositional hearing may enter its judgment making
> any of the following dispositions to protect the
> welfare of the youth:
>
> . . .
>
> (3) transfer legal custody to any of the
> following:
>
> (c) a relative or other individual who, after
> study by a social service agency designated by the
> court, is found by the court to be qualified to
> receive and care for the youth;

Under this statute it is only necessary that the child
be a "youth in need of care," defined in 41-3-102(11), MCA,
as a youth who is "abused, neglected, or dependent." Termi-
nation of the parent child relationship requires much more
stringent criteria. The relevant statute, § 41-3-609, MCA,
lists three requirements which must be established before
parental rights may be terminated. Those requirements are 1)
that the child is an adjudicated youth in need of care, 2) a
court approved treatment plan has not been complied with or
been successful, and 3) the conduct or condition causing the
problem cannot be rectified within a reasonable time. Sub-
section (2) of that statute enumerates several factors for
guidance in the determination of the third requirement.

The effect of a decree terminating the parent-child
relationship is explained in § 41-3-611, MCA, which states
that the decree operates to divest the child and the parents
of "all legal rights, powers, immunities, duties, and obliga-
tions with respect to each other. . ." Only the child's
right to inherit is excepted from this.

The effect of termination of parental rights was ex-
plained in Matter of V.B. (Mont. 1987), 744 P.2d 1248, 1250,
44 St.Rep. 1838, 1841. In that case we stated that "when

9

parental rights are terminated, the natural parent no longer has <u>any</u> rights over the child. This includes visitation rights."

This Court has previously acknowledged the difference in an order granting long-term custody until age 18 and an order terminating parental rights. We recognized the distinct nature of each disposition and the differences in statutory requirements in the case of Matter of A.H., (Mont. 1989), 769 P.2d 1245, 46 St.Rep. 395. That case affirmed the termination of parental rights as to one child and the granting of long-term custody until age 18 as to the other two children. In <u>Matter of A.H.</u> we concluded that the district court had terminated parental rights to one child because the statutory factors of § 41-3-609, MCA, were met. We also concluded that the other two children were appropriately put in long-term custody until age 18 because they were determined to be "youths in need of care," pursuant to § 41-3-404, MCA. Thus this Court implicitly recognized that the granting of long-term custody until age 18 is not the equivalent of a termination of parental rights, and that different statutory criteria apply to each disposition.

An award of long-term custody does not totally terminate the rights of the natural parent. In the present case, although mother's visitation rights are restricted, she may still visit her child, and may possibly petition for less restricted visitation in the future. Additionally, mother may at some point in the future petition the District Court to regain custody of R.T.L.P. While the record demonstrates a grievous incapacity to parent, it is conceivable that mother could develop as a parent to the point where it would be appropriate to restore custody to her. Possibly there are other factors which could alter the effect of the long-term custody decree. Mother's rights as the parent of R.L.T.P.

10

have not been terminated by the award of long term custody until age 18. The award of custody until the child's age of majority gives stability to the child's future and prevents repeated litigation over custody. The proper inquiry is whether parental rights have actually been terminated. Because parental rights have not been terminated we hold that a grant of long-term custody is not the equivalent of a termination of parental rights.

### III

Is mother entitled to effective assistance of counsel at a hearing which granted long-term custody of her son to his grandparents?

Mother alleges that her legal representation at the custody hearing was less than effective, citing certain evidence which her attorney did not present. Mother contends that she was entitled to effective assistance of counsel at the hearing which determined the custody of her child, R.T.L.P. This contention fails because it is premised on an incorrect assumption.

Mother urges that the parent-child relationship is a fundamental liberty interest entitled to constitutional protection. The cases cited in support of this argument however, involved a termination of parental rights. See, e.g., Matter of R.B. (1985), 217 Mont. 99, 103, 703 P.2d 846, 848, citing Santosky v. Kramer (1982), 455 U.S. 745, 753-54, 102 S.Ct. 1388, 71 L.Ed.2d 599. In Matter of R.B. we stated that a termination of parental rights must be protected by "fundamentally fair procedures," and that the court must address each statutory requirement of termination. Matter of R.B., 703 P.2d at 848. In the present case, the procedure followed by the court was fundamentally fair as far as this party is concerned. We find no authority for mother's contention that a parent is entitled to effective assistance of

11

counsel in a termination proceeding. Furthermore, as we concluded in Issue I, the present case is not a termination because it does not involve the severing of a parent-child relationship. Therefore, we need not address mother's contentions regarding effective assistance of counsel.

Affirmed.

_____
Justice

We Concur:

_____

_____

_____

_____
Justices

12