No. 90-297

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

IN THE MATTER OF B.N. and T.N.,
and M.M., A.M. and T.G.M.,
Youths in Need of Care.

FILED
DEC 11 1990
Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:  District Court of the First Judicial District,
In and for the County of Lewis and Clark,
The Honorable Jeffrey M. Sherlock, Judge presiding.


COUNSEL OF RECORD:

For Appellant:

Joseph R. Massman, Esq., Massman Law Firm, Helena,
Montana (Father and Paternal Grandparents)

William P. Driscoll, Esq., Gough, Shanahan, Johnson
and Waterman, Helena, Montana (Mother)

For Respondent:

Mike McGrath, County Attorney; Leo J. Gallagher,
Deputy County Attorney, Helena, Montana

Hon. Marc Racicot, Attorney General; Elizabeth L.
Griffing, Assistant Attorney General, Helena,
Montana

J. Mayo Ashley, Esq., Public Defender, Helena,
Montana

Randi Hood, Esq., Public Defender, Helena, Montana


Submitted on Briefs:  October 26, 1990

Decided:  December 11, 1990

Filed:

Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

R.N.M. (mother) and T.N. (father), parents of B.N. and T.N., appeal the judgment of the First Judicial District, Lewis and Clark County, which terminated their custodial rights of their children and awarded legal custody to the Montana Department of Family Services. The paternal grandparents of the children also join in the appeal. We affirm.

The issue presented on appeal is whether the record lacked substantial evidence to support the District Court's order to terminate the natural parents' custodial rights of their two children.

The mother and father married in 1980. The marriage produced two daughters, B.N., born November 7, 1980, and T.N., born October 27, 1981. The marriage also marked the beginning of a ten-year history of family turmoil and parental neglect as recorded by the Lewis & Clark County Department of Family Services (Department).

In 1980 and just thirty-two days following B.N.'s birth, the Department began receiving reports lodged against either one or both of the parents for parental neglect. Three months following T.N.'s birth, T.N. was hospitalized for "failure to thrive."

In 1982, Dr. Robert J. Bateen, a clinical psychologist, evaluated mother and father at the request of the Child Protective Services. Dr. Bateen found that mother had a low IQ of seventy-six and that she was an "overwhelmed mother who was lacking in skills." Dr. Bateen found that father had an even lower IQ of

1

fifty-nine, rendering him a mental age of a first or second grader. Dr. Bateen also established father's history of physical violence through accounts given by mother.

Later in 1982, the Department received a report alleging that father was physically abusing his wife and his oldest daughter, B.N. This report was followed by the October 27, 1982, filing of an abuse complaint lodged against father by a social worker of the Department, who was at St. Peter's Hospital when B.N. was receiving treatment for contusions, bruising, and swelling to the head area, injuries allegedly inflicted by father.

No legal action was pursued against the parents at this time as mother decided to live apart from father, and father consented to evaluation and treatment at Montana State Hospital in Warm Springs. Upon his release from this hospital, however, the Department received reports that father had returned to living at the family residence, contrary to an informal agreement between the Department and the parents.

On April 14, 1983, the State petitioned the District Court for temporary custody and temporary investigative authority regarding B.N. and T.N., based on further reports of father's violent behavior and both parents' neglectful behavior toward their children. The children were temporarily placed in foster care, but were eventually returned to their mother, who then departed with the children to Wyoming in August of 1983. Following mother's

2

departure, father petitioned for dissolution of marriage on September 7, 1983.

The petition for temporary custody and temporary investigative authority resulted in a court-ordered custody investigation by Rita Pickering of Lewis & Clark County Human Services. In her report to the court, dated February 17, 1984, Pickering recommended that 1) mother be given custody of the children while she continues professional counseling to improve and monitor her parenting skills, and, 2) father be given supervised visitation rights. Pickering's report stated that mother had few developed parenting skills, but she had the potential and desire to learn to care for her children. Pickering's report further stated that father's "history of poor frustration control" created a potentially dangerous situation for the children.

In August of 1984, mother and father signed a custody agreement which granted mother sole-custody of the children and granted father supervised visitation rights. On January 16, 1985, the court dissolved the parents' marriage incorporating the custody agreement into the decree. No further action was pursued with regard to the petition for temporary custody and temporary investigative authority, and it was eventually dismissed on July 7, 1987.

From the time of the custody agreement through 1988, father, along with his parents, regularly contested mother's refusal to grant father supervised visitation rights and questioned if mother

3

was providing adequate care to the girls. These disputes resulted in three petitions to enforce visitation rights. Meanwhile, mother entered a common-law marriage with B.M., a long-haul truck driver, and had three more children: M.M., born June 16, 1986; A.M., born February 18, 1988; and T.M., born August 19, 1989. Mother, B.M. and all the children resided mainly in Idaho and Washington at this time, but eventually moved to Helena in 1989.

In July, 1988, the State filed a second petition for temporary custody and investigative authority based upon an incident involving mother's brother and his girlfriend of Helena. On July 16, 1988, mother and B.M. left the children (except T.M., who was not yet born), with mother's brother and his girlfriend so mother could accompany B.M. on a long-haul trucking trip. Mother assured her brother that they would return in several days. She gave her brother and his girlfriend $20.00 to cover the costs associated with the children's care, and left clothing for the children, some covered with human feces and so filthy that the clothing was discarded. Additionally, T.N. had head lice, which had been left untreated by mother. Mother and B.M. did not return for the children for one month.

Following a preliminary investigation, records of the Department revealed that several reports of neglect and abuse were lodged against the family while living in Idaho and that Idaho welfare workers reported a consistent lack of success in working with mother and B.M. to remedy the problems.

4

On August 4, 1988, the District Court granted the State temporary custody of all the children and temporary investigative authority. B.N. and T.N. were placed in foster care with their paternal grandparents. In December of 1988, all parties stipulated to the entry of a treatment plan. B.M. and mother recovered custody of M.M. and A.M. a few days before Christmas of 1988. On January 18, 1989, the District Court adjudicated all the children as youths in need of care.

B.M. and mother once again became parents when T.M. was born on August 19, 1989. Following his birth, the treatment plan was extended to include T.M. as well. Currently, mother and B.M. continue to have custody of M.M., A.M., and T.M., and are complying with the treatment plan. The District Court approved the treatment plan on March 14, 1989.

Mother and B.M., however, did not recover physical custody of B.N. and T.N., and they continued to reside in the home of their paternal grandparents until October 27, 1989. While living with their grandparents, the girls began therapy with Mary Grace Black, a licensed clinical social worker, who assessed that both girls had suffered physical, emotional, and sexual abuse while residing with their mother and B.M. While living with their grandparents, the girls' school attendance and performance improved; however, further problems ensued.

Initially, father resided with the paternal grandparents when they assumed physical custody of the girls. However, following the

children's disclosures that father sexually abused them, father was forced to move out of the grandparents' home. The children were then removed from the paternal grandparents' home on October 27, 1989, when it was discovered that, on one occasion, they had allowed father to see the children unsupervised following the children's disclosures of sexual abuse. Currently, T.N. and B.N. are living with a maternal aunt in Billings. According to Mary Grace Black, the children are continually improving emotionally and are responding well to their new environment.

The State petitioned to terminate parental rights of mother and father on November 7, 1989. A hearing was held in District Court on January 25, January 30, and February 2, 1990. Several witnesses testified that they felt that mother and B.M. need long-term counseling, that it was doubtful that mother could be an effective parent to all five of her children at this time, and that father was not capable of parenting B.N. and T.N. at this time.

On March 20, 1990, the District Court terminated the parental custodial rights of mother, father and B.M. and awarded permanent custody of B.N. and T.N. to the Montana Department of Family Services. The District Court granted visitation rights to the parents and paternal grandparents under the supervision and directives of the Lewis and Clark Department of Family Services. From this decision, mother, father, and the paternal grandparents appeal.

Did the record lack substantial evidence to support the District Court's order to terminate the natural parents' custodial rights of their two children?

The District Court ordered that "[t]he parental <u>custodial</u> rights of [mother, father, and B.M.] in and to the youths, [B.N. and T.N.], and to their property, are hereby <u>terminated</u>." (Emphasis added.) The court then awarded "permanent legal custody" to the Department and gave the Department the right to place the children in foster care. The court also awarded supervised visitation rights to the parents and grandparents.

The State, in its brief, properly addresses that, upon a superficial reading of the order, confusion exists with regard to the District Court's intent--did the court intend to terminate the parties' parental rights or did the court intend to grant the State long-term custody? Termination of parental rights involves severing the parent-child legal relationship and after such action, the parents have no right to notice or consent to the adoption of the child. Section 41-3-611, MCA. And, the term "permanent custody" vests the person or agency with such custody the right to "consent to the adoption of [the child]." 11.5.508, ARM. Furthermore, under § 41-3-609, MCA, three requirements must be satisfied to terminate parental rights: 1) the child must be adjudicated a youth in need of care, 2) a court-approved treatment plan must be violated or deemed unsuccessful, and 3) the conduct or condition causing the problem cannot be rectified within a

7

reasonable amount of time. The termination of parental rights results in the natural parents losing all rights to the child, including visitation rights. Section 41-3-611(1), MCA; Matter of C.P. (1986), 221 Mont. 180, 183, 717 P.2d 1093, 1095.

An award of long-term custody, however, does not fully sever a parent's rights with regard to the child:

> An award of long-term custody does not totally terminate the rights of the natural parent. In the present case, although mother's visitation rights are restricted, she may still visit her child, and may possibly petition for less restricted visitation in the future. Additionally, mother may at some point in the future petition the District Court to regain custody of R.T.L.P.

Matter of R.T.L.P. (1989), 238 Mont. 384, 391, 777 P.2d, 892, 896. Under § 41-3-406, MCA, an award of long-term custody to the State only requires that the child be found to be "abused, neglected or dependent." The pertinent term to these facts, "abused or neglected child," is defined as "a child whose normal physical or mental health or welfare is harmed or threatened with harm by the acts or omissions of his parent or other person responsible for his welfare. Section 41-3-102(2), MCA.

Upon reviewing the record, it is clear that neither the State nor the District Court intended to fully sever the parties' parental rights to B.N. and T.N., although the court unfortunately used the words "termination" and "permanent custody" in its order. During the hearing, the State asserted that in its request for permanent custody, it did not "envision a total termination of the

parental rights of either the father or the mother," and recognized the necessity of continued visitation with the parents and grandparents. The District Court awarded supervised visitation rights to mother, father and paternal grandparents, this visitation award being inconsistent with terminating parental rights. And, in its conclusions of law, the District Court cited § 41-3-406, MCA, the statute providing for long-term custody, as authority for its actions. Most noteworthy, as the State asserts in its brief, the District Court's order did not authorize the Department to allow the adoption of B.N. and T.N.; the order merely gave the Department custody of the children.

Based on the above we hold that the District Court in its order, intended to grant the State long-term custody. Accordingly, substantial evidence must exist in the record to support the premise that the children were abused, neglected, or dependent under §§ 41-3-102(2), and 41-3-406, MCA. Clearly, the ten-year history of family turmoil as previously recited in this opinion provides substantial, if not overwhelming evidence that B.N. and T.N. were abused, neglected or dependent while in the custody of mother. In fact, we believe that the evidence supports terminating the parental rights of mother and father, even though this harsher result was not the District Court's intent.

And unfortunately, while evidence reflects that the paternal grandparents made a noble attempt to provide a stable environment to the girls while in their foster care, evidence also reflects

9

that because of father's accessibility to the children and the bad relations between mother's and father's families, the children's physical or mental health or welfare are threatened with harm. Therefore, the children still qualified as abused, neglected, or dependent. Furthermore, it is the child's best interest, not the parents' or grandparents', that is the paramount concern in child custody matters. Matter of V.B. (1987), 229 Mont. 133, 136, 744 P.2d 1248, 1250 (citations omitted). From reviewing the record, we believe that at the present time, it is in the best interest of B.N. and T.N. to be placed in a foster home. We therefore affirm the District Court's order.

Affirmed.

_____
Chief Justice

We concur:

_____

_____

_____

_____
Justices