No. 98-122

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 36

IN THE MATTER OF

S.M., R.D., Jr., D.D., S.D.. C.D., and J.D.,

Youths in Need of Care.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone,

The Honorable Maurice R. Colberg, Jr., Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Kathryn S. Syth, Attorney at Law, Billings, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General, Helena, Montana

Mark Mattioli, Assistant Attorney General, Helena, Montana

Sheila Kolar, Deputy County Attorney, Billings, Montana

Damon L. Gannett, Gannett Law Firm, Billings, Montana

*Guardian ad litem*

Submitted on Briefs: December 10, 1998

Decided: March 2, 1999

Filed:

_____

Justice Karla M. Gray delivered the Opinion of the Court.

¶1. Betty Davey (Betty) appeals from the judgment entered by the Thirteenth Judicial District Court, Yellowstone County, on its findings of fact, conclusions of law and order terminating her parental rights and awarding custody of her minor children to the Montana Department of Public Health and Human Services (Department). We affirm.

¶2. The dispositive issue on appeal is whether the District Court erred in terminating Betty's parental rights pursuant to § 41-3-609(1)(c), MCA (1995).

*BACKGROUND*¶3. Betty is the natural mother of a daughter, S.M. The Department first became involved with Betty in 1984, when it received substantiated reports of S. M. being sexually abused by her natural father. The Department sought and received Temporary Investigatory Authority (TIA) relating to S.M.'s sexual abuse, but the TIA later was dismissed when the family left Montana. Betty subsequently divorced and returned to Montana with S.M.

¶4. Betty married Robert Davey, Sr. (Robert) in 1985. They have three sons, D.D., S. D., C.D., and a daughter, J.D. Robert also had a son, R.D., Jr., from a previous marriage. S.M., R.D., Jr., D.D., S.D., C.D. and J.D. all lived with Betty and Robert.

¶5. In March of 1987, the Department petitioned for, and the District Court granted, a TIA based on reports that Robert was physically abusing R.D., Jr., and the Department later received temporary custody of R.D., Jr. Robert moved out of the house in 1994, after he became abusive towards the other children and the court prohibited unsupervised contact.

¶6. After Robert left, the Department received reports that he was making unsupervised visits to the house, that he allegedly sexually assaulted an adult woman, that he was having a difficult time financially supporting himself and that the boys were displaying abnormal sexual behaviors. In order to monitor the contact between Robert and the children, the Department petitioned for temporary custody of all six children in April of 1994.

¶7. Prior to the hearing on the Department's petition, S.M. told a social worker that her uncle, who lived in the basement, had inappropriate sexual contact with her. Betty was reluctant to contact the police, and did so only at the social worker's insistence. The social worker also insisted that the uncle move out of the basement immediately. At the temporary custody hearing the next day, however, Betty indicated that the uncle had not moved out of her basement; in fact, he was babysitting the children while she attended the hearing.

¶8. On May 23, 1994, the District Court granted the Department temporary custody of all six children based on its determination that they were youths in need of care. While retaining temporary custody, the Department initially allowed the children to remain in Betty's care.

¶9. Charles Sterling (Chuck) began living with Betty sometime in 1994, and Chuck's brother, Bobby Sterling (Bobby), began to frequent the household. In May of 1995, the Department received reports that Bobby had made several inappropriate sexual advances toward S.M. When the Department confronted Betty with the allegations, she minimized the incident and later said that she did not like to take sides.

¶10. In May of 1995, S.M. told a social worker that she was getting up in the mornings to get the boys ready for school because Betty was out with Chuck. The Department also received a referral that Bobby was sexually abusing S.M. J.D. reported that C.D., age eight, and R.D., Jr., age fourteen, touched her "privates" on several occasions and once made her eat "poop" when Betty left the two boys to babysit. The Department also received reports that Betty allowed Robert to make unauthorized visits to see the children. The Department subsequently placed the children in foster care based on Betty's inability to protect them and, thereafter, Betty and the children received counseling and evaluations by various medical professionals.

¶11. In August of 1995, a social worker explained to Betty that further contact between Bobby and the children was contrary to the children's welfare. Thereafter, Betty brought Bobby to one of S.M.'s therapy appointments and S.M. "fell apart" when she saw him. Betty also brought Bobby to a church service S.M. was attending; Bobby reportedly began rubbing S.M. and she again "fell apart."

¶12. The District Court began approving treatment plans for Betty in June of 1995.

The plans outlined several tasks, including that she attend parenting and counseling sessions, maintain a clean and safe home environment, use only appropriate disciplinary methods, protect the children from abuse, teach the children appropriate grooming skills and not allow Bobby access to any of the children.

¶13. By June of 1996, the Department determined that Betty's treatment plans had not been successful. As a result, it petitioned for permanent legal custody, termination of parental rights and the right to consent to adoption concerning D.D., S.D., C.D., and J.D. The Department also petitioned to extend its temporary custody of S.M. and R.D., Jr. until they reached the age of eighteen. S.M. turned eighteen during the pendency of the petition, rendering the Department's petition for her temporary custody moot. The Department continued to work with Betty and implemented two more court-approved treatment plans after filing its petition.

¶14. The District Court held hearings on the Department's petitions during January, March and April of 1997. The court subsequently issued findings of fact, conclusions of law and an order terminating the respective parents' parental rights and awarding permanent custody of D.D., S.D., C.D. and J.D. to the Department and temporary custody of R.D., Jr. to the Department until he reaches the age of eighteen. Betty appeals.

*STANDARD OF REVIEW*¶15. We review a district court's decision to terminate parental rights to determine whether its findings of fact are clearly erroneous. In re E.W., 1998 MT 135, ¶ 9, 959 P.2d 951, ¶ 9, 55 St.Rep. 536, ¶ 9 (citation omitted). Findings of fact are clearly erroneous if they are not supported by substantial evidence; or, if so supported, the district court misapprehended the effect of the evidence; or, if so supported and the district court did not misapprehend the effect of the evidence, this Court is left with the definite and firm conviction that a mistake has been committed. *In re E.W.*, ¶ 10 (citation omitted). We review a district court's conclusions of law to determine whether they are correct. *In re E.W.*, ¶ 9 (citation omitted).

*DISCUSSION*¶16. Did the District Court err in terminating Betty's parental rights pursuant to § 41-3-609(1)(c), MCA (1995)?

¶17. A district court may terminate a person's parental rights if it finds that the child is an adjudicated youth in need of care, an appropriate treatment plan approved by

the court has not been complied with or has not been successful, and the conduct or condition rendering the parent unfit is unlikely to change within a reasonable time. Section 41-3-609(1)(c), MCA (1995). Here, the District Court found that the three statutory circumstances existed and terminated Betty's parental rights. Betty does not dispute that the children were youths in need of care. She contends, however, that the District Court's findings that her minimum compliance with the treatment plans was insufficient, the treatment plans were unsuccessful and the conduct rendering her unfit was unlikely to change within a reasonable time are clearly erroneous.

A. *Completion and success of Betty's treatment plans*

¶18. The District Court approved four treatment plans designed to stabilize Betty's environment, improve her relationship with her children and provide the Department with information to aid it in determining whether to return her children to her care. The first treatment plan began in June, and ended in September, of 1995. Social worker Lori Baxbaum (Baxbaum), administered the first plan and the first task of that plan required Betty to obtain a psychological evaluation and follow the psychologist's recommendations. The record reflects that Betty obtained the evaluation but, according to Baxbaum, she failed to attend meetings with a co-dependency group as recommended by the psychologist. The plan also required Betty to avoid involvement with persons suspected of criminal activity, but Baxbaum testified that Betty continued to have contact with Bobby even though he was suspected of sexually abusing S.M.

¶19. Task five of the first treatment plan required Betty to attend parenting classes and she did so. The record reflects, however, that she was unsuccessful in applying the knowledge and skills taught in those classes. For example, Baxbaum testified that Betty continued to bring unhealthy snacks to her visits, which was inconsistent with encouraging D.D.--who was overweight--to lose weight. Another task required Betty to work with Family Network, Inc., a parenting workshop, to learn how to apply various parenting skills. Baxbaum testified that Family Network, Inc. discontinued Betty's involvement with the program due to her lack of interest. Baxbaum also testified that Betty was unable to provide controlled, structured and appropriate discipline during visits with the children as required by the treatment plan.

¶20. Betty's second treatment plan began in December of 1995 and ended in June of

1996. Social worker Sandy Velin (Velin) administered the plan and observed Betty's progress. One task required Betty to teach the children appropriate grooming skills through verbal communication and by example. Velin testified, however, that Betty's own grooming was inconsistent; she often had strong body odor, bad breath, and appeared to be wearing soiled clothing. Another task required Betty to provide a healthy and safe environment for the children, which included obtaining employment, maintaining her home in a sanitary condition and keeping Bobby away from the household and children. Betty did obtain employment in March of 1996, but Velin testified that the gas heat at Betty's home had been disconnected, resulting in inadequate heat. On a later visit, Velin noted that the home was dirty and cluttered. In addition, Velin testified that Bobby continued to visit the household occasionally. In Velin's opinion, the home was neither safe nor sanitary. Her ultimate opinion was that the second treatment plan was unsuccessful.

¶21. The third treatment plan included tasks from the prior treatment plans and covered the period from June through December of 1996. Velin noted that Betty's grooming improved during this time, but still was not consistent. Baxbaum visited the home in September of 1996, and reported that it was kept in an unsanitary condition. The third treatment plan also required Betty to learn about nutrition and bring appropriate servings of food to visits with the children, but Velin observed that Betty brought servings that were too large and allowed the children to eat too much. Betty also failed to prepare a written plan on how to keep the children safe from sexual abuse, as required by the treatment plan. As with the second treatment plan, Velin opined that Betty had not successfully completed the third treatment plan.

¶22. Betty's fourth treatment plan began in December of 1996. Baxbaum testified that Betty verified attending only two of eight required co-dependency meetings. According to the record, Betty's home was visited again and found to be unsafe and unsanitary. Betty did not develop a household budget, as required by the treatment plan. Moreover, while another task required Betty to exhibit a willingness and desire to protect her children from Bobby by not having any contact with him, it was Baxbaum's opinion that Betty had not internalized the desire to protect her children from Bobby, but kept him away from the residence only because the Department instructed her to do so. Baxbaum opined that Betty had not successfully completed the fourth treatment plan.

¶23. Against this backdrop of evidence supporting the District Court's findings that

Betty's minimum compliance with the treatment plans was insufficient and the treatment plans were unsuccessful, Betty points to testimony indicating that she completed some of the required tasks and improved in others. On that basis, she contends that she substantially complied with the treatment plans and that the goals of her treatment plans were successful.

¶24. The fact that Betty completed some tasks does not conflict with the District Court's finding that her minimal compliance was insufficient. Moreover, as discussed above, the record is clear that Betty did not complete all the tasks in any of the treatment plans. Further, the fact that Betty improved in certain tasks and goals set forth in the treatment plans does not necessarily equate to the plans being successful. Betty attempted four treatment plans over two years and, in the opinion of both Baxbaum and Velin, the plans were unsuccessful.

¶25. There is no question that Betty made well-intentioned efforts towards successful completion of her treatment plans. Such efforts, however, do not demonstrate either the completion or the success of the plans. *See* Matter of D.S.N. (1986), 222 Mont. 312, 315, 722 P.2d 614, 616. Indeed it is well established that a treatment plan can be unsuccessful even when the tasks were completed. *See* Matter of R.B.O. (1996), 277 Mont. 272, 281, 921 P.2d 268, 273 (citing Matter of S.C. (1994), 264 Mont. 24, 29, 869 P.2d 266, 269).

¶26. The record before us clearly contains substantial evidence supporting the District Court's findings that Betty's minimum compliance with the treatment plans was insufficient and that the treatment plans were not successful. The District Court did not misapprehend the evidence and we are not left with a definite and firm conviction that a mistake has been committed. We conclude, therefore, that the District Court's findings that the circumstances set forth in § 41-3-609(1)(c)(i), MCA (1995), existed are not clearly erroneous.

B. *Conduct unlikely to change within a reasonable time*

¶27. In determining whether the conduct or condition rendering a parent unfit is unlikely to change within a reasonable time, a trial court must find that continuing the parent-child relationship likely will result in continued abuse or neglect, or that the conduct or condition of the parent renders her unfit, unable or unwilling to give

the child adequate parental care. Section 41-3-609(2), MCA (1995). In making either finding, a court must consider seven factors including:

(a) emotional illness, mental illness, or mental deficiency of the parent of such duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time;

. . . .

(g) any reasonable efforts by the protective service agencies that have been unable to rehabilitate the parent.

Sections 41-3-609(2)(a) and (g), MCA (1995).

¶28. The District Court determined that Betty's inability to protect her children from abuse by others rendered her unfit and that the conduct, having failed to change significantly in the past, was unlikely to change within a reasonable time in the future. As a result, the court found that the continuation of Betty's relationship with her children would likely result in continued abuse and neglect and that her conduct rendered her unfit, unable or unwilling to provide parental care to her children. Again, we review the record to determine whether substantial evidence supports the District Court's ultimate finding that the conduct rendering Betty unfit was unlikely to change within a reasonable time.

¶29. Betty obtained two psychological evaluations at the request of the Department. In June of 1995, Dr. William Dee Woolston diagnosed Betty with adjustment, anxiety and dependent personality disorders. Dr. Bruce Chessen conducted a second evaluation of Betty in January of 1997, and noted that she had made no significant progress since Dr. Woolston's 1995 diagnosis. As a result of Betty's disorders, both doctors expressed concern over her inability to protect her children from abuse by others and testified that Betty's disorders were chronic and unlikely to change within a reasonable time. The doctors' testimony clearly addressed the factor set forth in § 41-3-609(2)(a), MCA (1995), and provides substantial support for the District Court's findings that Betty's relationship with her children would likely result in continued abuse and neglect, her conduct rendered her unfit, unable or unwilling to provide parental care to the children and, ultimately, that her conduct was unlikely to change within a reasonable time.

¶30. Moreover, the record is replete with evidence of the Department's "reasonable efforts" to rehabilitate Betty, consideration of which is required by § 41-3-609(2)(g), MCA (1995). Betty was provided with four treatment plans, parenting classes and numerous counseling sessions over a two-year period. The number and length of the treatment plans, as well as the extensive efforts made by the Department to rehabilitate Betty, provide substantial support for the District Court's findings that Betty's continued relationship with her children would likely result in continued abuse and neglect, her conduct rendered her unfit, unable or unwilling to provide parental care to the children and her conduct was unlikely to change within a reasonable time.

¶31. Betty again relies on testimony indicating that she improved various parental skills, and she argues that spending one hour a week with the children was an inadequate amount of time to demonstrate those improved skills. As discussed above, improvements and well-intentioned efforts do not establish either the completion or the success of a treatment plan. *See*, *e.g.*, *Matter of D.S.N.*, 222 Mont. at 315, 722 P.2d at 616. Furthermore, considering the number and duration of Betty's unsuccessful treatment plans, the doctors' testimony regarding her prospects for improvement in protecting her children from abuse by others and social worker testimony that the children required a stable and structured home environment which Betty could not provide, it is clear that substantial evidence supports the District Court's finding that the conduct rendering Betty unfit was unlikely to change within a reasonable time. The court did not misapprehend the evidence and we are not left with a definite and firm conviction that a mistake has been committed. Consequently, we conclude that the District Court's finding was not clearly erroneous.

¶32. Betty's final contention is that, in the event this Court holds that the District Court properly terminated her parental rights, the District Court abused its discretion in failing to provide for continuing contact with her children. Betty did not request continuing contact in her proposed findings of fact and conclusions of law in the District Court, however, and it is well settled that this Court will not consider issues raised for the first time on appeal. *See* Cenex v. Board of Com'rs for Yellowstone (1997), 283 Mont. 330, 337-38, 941 P.2d 964, 968 (citations omitted). Moreover, Betty cites to no legal authority in support of her contention as required by Rule 23(a)(4), M.R.App.P. As a result, we decline to address this matter further.

¶33. We hold that the District Court did not err in terminating Betty's parental

**rights pursuant to § 41-3-609(1)(c), MCA (1995).**

**¶34. Affirmed.**

/S/ KARLA M. GRAY

We concur:

/S/ J. A. TURNAGE

/S/ W. WILLIAM LEAPHART

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER