No. 99-590

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 92N

IN THE MATTER OF

C.J.L., S.A.L., Jr., and B.L.M.,

Youths in Need of Care.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone,

The Honorable Diane G. Barz, Judge presiding.

COUNSEL OF RECORD:

**For Appellant:**

Kathryn S. Syth, Attorney at Law Billings, Montana

**For Respondent:**

Hon. Joseph P. Mazurek, Attorney General; Tammy K. Plubell,

Assistant Attorney General; Helena, Montana

Melanie Logan, Deputy County Attorney, Billings, Montana

Guardian Ad Litem:

Damon L. Gannett; Gannett Law Firm, Billings, Montana

Submitted on Briefs: March 9, 2000

Decided: April 11, 2000

Filed:

_____

Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

¶1.Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent but shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number, and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.

¶2.Cheryl Damjanovich (Cheryl) appeals from the Findings of Fact, Conclusions of Law and Judgment entered by the Thirteenth Judicial District Court, Yellowstone County, terminating her parental rights to C.J.L., S.A.L., Jr., and B.L.M. and awarding permanent legal custody with the right to consent to adoption to the Montana Department of Public Health and Human Services (DPHHS). We affirm.

¶3.The sole issue on appeal is whether the District Court's finding of fact that the conduct or condition rendering Cheryl unfit to parent her children is unlikely to change within a reasonable time is clearly erroneous.

## BACKGROUND

¶4.Cheryl is the natural mother of a daughter, C.J.L., born on November 11, 1989, and a son, S.A.L., Jr., born on June 6, 1994. C.J.L. and S.A.L.'s natural father is deceased. Cheryl and David Miller (David) are the natural parents of a daughter, B.L.M., born on May 14, 1998. The District Court terminated David's parental rights over B.L.M., but he is not a party to this appeal.

¶5.DPHHS first became involved with Cheryl and her children in 1995. DPHHS received, investigated and closed three separate reports in 1995. The first report stemmed from a visit to the emergency room during which an old skull fracture was discovered in S.A.L.'s x-rays. The second report involved a young caregiver who was unable to contact Cheryl or obtain medical care for S.A.L. after he cut his finger on a can. The third report included general allegations of filth and neglect due to Cheryl's drug use, which Cheryl denied.

¶6.DPHHS again became involved with Cheryl and her children in 1997. On March 10, 1997, Cheryl

was arrested for possession of dangerous drugs and drug paraphernalia at a house well known for drug trafficking. Two days later, DPHHS received a report that Cheryl had been arrested, her children were not receiving proper care and C.J.L. did not even know the name of the person caring for her and her brother. DPHHS also received a report that an individual had been arrested in Cheryl's home on a parole violation and that officers had discovered broken mirrors, razor blades, used syringes, knives, and a hand-made machete on the floor and a loaded sawed-off shotgun in the home. DPHHS social worker Sarah Blackburn (Blackburn) went to the home and found it in great disarray, with two adult males and a juvenile female living there and caring for Cheryl's children. One of the adult males was the owner of the sawed-off shotgun.

¶7. Blackburn removed S.A.L. from the home, picked up C.J.L. from school and placed both in emergency foster care. On March 14, 1997, DPHHS petitioned for Temporary Investigative Authority (TIA) and protective services over C.J.L. and S.A.L. The District Court granted the TIA and scheduled a show cause hearing. Cheryl failed to appear.

¶8. Cheryl met with DPHHS social worker Dawn Stuber-Daem (Stuber-Daem) on March 25, 1997. Cheryl told Stuber-Daem she pled not guilty to the drug-related charges and denied ownership of the drugs found in her purse. DPHHS subsequently moved C.J.L. and S.A.L. to their maternal grandparents' home.

¶9. DPHHS provided Cheryl a treatment plan for the three-month period beginning March 26, 1997. This treatment plan required Cheryl to complete a chemical dependency evaluation and follow through with any recommendations, attend Alcoholics Anonymous (AA) or Narcotics Anonymous (NA) and provide DPHHS with written verification of attendance, attend individual counseling, refrain from all criminal activity, maintain a home, attend parenting classes, meet with the social worker and visit with her children as scheduled. Cheryl signed, and the District Court approved, this treatment plan. Stuber-Daem also referred Cheryl to Alternatives, Inc., for random urinalysis (UA) testing.

¶10. During the period this treatment plan was in effect, Cheryl completed a chemical dependency evaluation. The evaluator concluded, based on the information Cheryl provided, that Cheryl was not chemically dependent. However, the evaluator recommended random UA testing to monitor future drug use and support-group meetings due to Cheryl's association with known addicts and her relationship with a practicing alcoholic. Cheryl did not follow through with these recommendations. Cheryl also failed to provide written verification of attendance at AA or NA, visit with C.J.L. and S.A.L. and meet with the social worker regularly. In addition, Cheryl never contacted Alternatives for UA testing.

¶11. DPHHS subsequently requested, and the District Court granted, a 90-day extension on the TIA. DPHHS and Cheryl entered a second treatment plan with the same requirements for the three-month period beginning June 20, 1997. During this period, Cheryl regularly met with Stuber-Daem as long as Stuber-Daem made home visits.

¶12. Stuber-Daem again referred Cheryl to Alternatives for random UA testing beginning July 10, 1997.

A week later, Stuber-Daem conducted a home visit and noticed Cheryl shifted the conversation from topic to topic and exhibited rapid mood swings, laughing one minute and crying the next. Cheryl stated she had lost the Alternatives referral and Stuber-Daem offered to take her to DPHHS for a copy and then to Alternatives to initiate the contract. Cheryl agreed but then changed her mind, saying she would obtain a new referral the following morning. Cheryl arrived in the afternoon, obtained the referral and provided a UA sample at Alternatives. This sample tested positive for methamphetamine. Cheryl attributed the results to over-the-counter cold medicine she had taken, but could not recall the name of the medication. Cheryl did not provide any further UA samples under this contract.

¶13. Subsequently, Stuber-Daem and a DPHHS intern supervised Cheryl's home visit with C.J.L. and S.A.L. and found an empty syringe package in the bathroom. When Stuber-Daem confronted Cheryl--via telephone--regarding the syringe package, Cheryl denied the syringe package was in her home.

¶14. DPHHS petitioned for temporary custody of C.J.L. and S.A.L. on September 10, 1997. Following a hearing on DPHHS' petition, the District Court adjudicated C.J.L. and S.A.L. youths in need of care, granted DPHHS temporary custody for six months and ordered Cheryl to participate in weekly UA testing. DPHHS prepared--and Cheryl signed--another court-approved treatment plan, with the same requirements as her earlier treatment plans, for the three-month period beginning September 20, 1997.

¶15. After Cheryl missed several meetings with Stuber-Daem, Stuber-Daem noticed she was pregnant when she appeared for the temporary custody hearing. When Cheryl, accompanied by David, next met with Stuber-Daem, Stuber-Daem inquired about the baby's due date. Cheryl stated their baby was due in June of 1998, denied using drugs, and stormed out of the office. Stuber-Daem explained the effects of drugs and alcohol on the baby to David.

¶16. Cheryl subsequently received a three-year deferred sentence on her felony possession of dangerous drugs charge and was placed on probation. Cheryl's probation officer informed Stuber-Daem that Cheryl tested positive for methamphetamine on October 10, 1997. DPHHS referred Cheryl to Alternatives for random UA testing during the period from November 3 through December 5, 1997, but Cheryl again failed to contact Alternatives. However, when tested by her probation officer, Cheryl tested positive for cannabinoids on December 3, 1997.

¶17. DPHHS provided, and Cheryl signed, a fourth court-approved treatment plan for December 20, 1997 through March 20, 1998. This treatment plan required Cheryl to complete a second chemical dependency evaluation, follow through with any recommendations made, abstain from the use of any alcohol or mood altering chemicals, attend and provide written verification of attendance at three AA or NA meetings per week, comply with the terms of her probation, and submit to UA testing on request of either her probation officer or DPHHS.

¶18. Stuber-Daem and Cheryl's probation officer met with Cheryl and informed her that her December 12 UA results tested positive for methamphetamine. Stuber-Daem also informed Cheryl that after birth, her baby could be removed from the hospital if she continued to use drugs. Cheryl continued to deny

using drugs, and her probation officer requested another UA test. The UA tested positive for methamphetamine.

¶19.Cheryl's probation officer made a surprise home visit on December 31, 1997. Cheryl was not there, but her children were at home with a baby sitter and drug paraphernalia was found. Cheryl was arrested, and Stuber-Daem removed C.J.L. and S.A.L. from the home and placed them in foster care. The maternal grandparents had left the children in Cheryl's care over Christmas without DPHHS' knowledge or approval. Cheryl subsequently completed a second chemical dependency evaluation which resulted in a recommendation for inpatient treatment, and Cheryl began treatment on February 26, 1998.

¶20.On March 16, 1998, DPHHS petitioned for permanent legal custody, termination of parental rights and the right to consent to adoption of C.J.L. and S.A.L. DPHHS prepared another court-approved treatment plan for Cheryl for March 20 through June 20, 1998. This treatment plan was identical to the previous plan except that, instead of obtaining another chemical dependency evaluation and following through with the recommendations, Cheryl was required to complete her inpatient treatment and follow through with the recommendations for aftercare. Cheryl was discharged from inpatient treatment on March 29, 1998, because of her failure to progress. Her relapse potential was high because of continued resistance to treatment.

¶21.Cheryl gave birth to B.L.M. on May 14, 1998, at which time both Cheryl and B.L.M. tested positive for methamphetamine. DPHHS immediately placed B.L.M. in protective custody, and subsequently petitioned the District Court to add B.L.M. to its petition for permanent custody and termination of parental rights.

¶22.Cheryl explained to Stuber-Daem that before she entered inpatient treatment, she had replaced the powder in her prenatal vitamins with crank, forgot she had done so and took the prenatal vitamins. Her probation officer reported, however, that Cheryl had been unable to provide a UA sample two days before B.L.M.'s birth and that, shortly before that, she had requested permission to go to the pharmacy because she was out of prenatal vitamins. Cheryl tested positive for methamphetamine again on June 2, 1998.

¶23.DPHHS entered into another court-approved treatment plan with Cheryl covering the three-month period beginning June 20, 1998. The only change in this treatment plan was the requirement to complete aftercare rather than inpatient treatment.

¶24.The District Court held a hearing on August 23, 1998, on DPHHS' petition for permanent legal custody and continued that hearing on September 24, 1998. The court continued the hearing a second time to give Cheryl additional time to comply with her treatment plans. DPHHS referred Cheryl to Alternatives for a UA test on September 24, 1998, but Cheryl failed to provide the UA sample. DPHHS prepared, and Cheryl signed, two additional court-approved treatment plans--with the same requirements as the previous plan--for the months through May 28, 1999.

¶25. DPHHS again referred Cheryl to Alternatives for weekly UA testing between September 28 and November 27, 1998. Cheryl called Stuber-Daem on November 9, 1998, claiming she had no way to get to Alternatives to provide a urine sample. When Stuber-Daem told her she needed to get there or the UA would be considered dirty, Cheryl went to Alternatives and tested positive for methamphetamine and amphetamine. The positive result was confirmed by the State Crime Lab and Cheryl subsequently was arrested for violating her probation.

¶26. DPHHS again referred Cheryl to Alternatives for random UA testing between February 2 and May 14, 1999. During this period, Cheryl was randomly selected for UA testing nine times. She failed to provide urine samples on five occasions and tested positive for methamphetamine and amphetamines on March 18, 1999.

¶27. The termination of parental rights hearing continued on May 14, 1999. Just prior thereto, Cheryl provided written verification of attendance at AA and NA meetings. However, she offered no evidence that she completed aftercare.

¶28. The District Court terminated Cheryl's parental rights and granted DPHHS permanent legal custody with the right to consent to adoption for C.J.L., S.A.L., Jr. and B.L.M. Cheryl appeals.

## STANDARD OF REVIEW

¶29. In a termination of parental rights case, we review a district court's findings of fact to determine whether they are clearly erroneous. *In re S.M.*, 1999 MT 36, ¶ 15, 293 Mont. 294, ¶ 15, 975 P.2d 334, ¶ 15 (citations omitted). A finding of fact is clearly erroneous if it is not supported by substantial evidence, the district court misapprehended the effect of the evidence, or a review of the record leaves us with the definite and firm conviction that the court made a mistake. *In re S.M.*, ¶ 15 (citation omitted).

## DISCUSSION

¶30. a. **Is the District Court's finding of fact that the conduct or condition rendering Cheryl unfit to parent her children is unlikely to change within a reasonable time clearly erroneous?**

¶31. The District Court found, as required for termination of parental rights under § 41-3-609(1)(e)(ii), MCA (1997), that the conduct or condition rendering Cheryl unfit to parent her children was not likely to change within a reasonable time. In making that determination, it relied on the following factors set forth in § 41-3-609(2), MCA (1997):

(d) excessive use of intoxicating liquor or of a narcotic or dangerous drug that affects the parent's ability to care and provide for the child;

. . .

(g) any reasonable efforts by protective service agencies that have been unable to rehabilitate the parent.

¶32.Cheryl contends that the court's finding of fact in this regard is clearly erroneous. Thus, we begin by reviewing the record to determine whether the District Court's finding that the conduct or condition rendering Cheryl unfit to parent her children was not likely to change within a reasonable time is supported by substantial evidence.

¶33.Cheryl concedes she was using methamphetamine as early as 1994 and was addicted to it when C.J. L. and S.A.L. were removed from her care in March of 1997. Over a period in excess of two years, eight treatment plans required, among other things, that Cheryl abstain from the use of alcohol and mood altering chemicals. Testimony at the termination of parental rights hearing, however, reflected only one treatment plan during which Cheryl did not either test positive for chemicals or fail to submit to a requested UA. Additionally, an Alternatives' urinalysis technician explained that, even when Cheryl's UA results were negative, they indicated some level of amphetamine in her system. Moreover, on May 14, 1998, at the time of B.L.M.'s birth, both Cheryl and B.L.M. tested positive for methamphetamine. Diane Feland (Feland), Cheryl's aftercare counselor, testified Cheryl had two lapses in her sobriety--one on May 30 and another on June 10, 1998--which were documented by positive UAs, and Cheryl admitted three relapses while she was participating in aftercare.

¶34.Two separate treatment plans required Cheryl to obtain a chemical dependency evaluation and follow through with the treatment recommendations. Although the record reflects that Cheryl obtained both evaluations, she did not follow through on the first evaluator's recommendations that she submit to random UA testing and attend co-dependency support meetings. During her second chemical dependency evaluation on January 9, 1998, Cheryl admitted using methamphetamine. The evaluator concluded that Cheryl was chemically dependent on methamphetamine and recommended inpatient treatment. Cheryl entered inpatient treatment on February 26, 1998, and was discharged on March 29, 1998, "[d]ue to [her] continued resistance to the process of treatment, her lack of involvement in treatment, and her obvious lack of commitment to continuing [chemical dependency] care . . . ."

¶35.When the District Court continued the termination hearing from September of 1998 to May of 1999, to allow Cheryl another opportunity to complete her treatment plan, it ordered her to submit to weekly UA testing. However, testimony at the final termination hearing reflected that DPHHS requested a one-time UA on September 24, 1998, and Cheryl failed to report and provide a UA sample for testing.

¶36.Finally, Cheryl conceded at the termination hearing that she was an addict and would always be a danger to her children. She stated that, having had at least four or five chances to stop using drugs, she always went back to using them. She also conceded that she was an unfit mother when she was under the influence of drugs. On this record, we conclude that the District Court's finding that the conduct or condition rendering Cheryl unfit to parent her children is not likely to change within a reasonable period of time is supported by substantial evidence.

¶37.Cheryl contends, however, that the District Court failed to consider evidence of the changes she has

made since her children were placed in the care of DPHHS. She urges that she has completed chemical dependency treatment and, absent a few minor relapses, has been successful in abstaining from drug usage. Moreover, Cheryl points to Feland's testimony that her relapses were isolated incidents to be expected during the process of recovering from drug addiction, she was making progress in her aftercare program and long-term improvements were possible with the passage of time.

¶38.Cheryl's contention ignores our standard of review, which is not whether evidence of record would support a different finding. Our standard is whether substantial evidence supports the District Court's finding of fact (*see In re S.M.*, ¶ 15) and, in making that determination, we do not substitute our judgment regarding the weight of the evidence for that of the trial court. *Matter of J.L.* (1996), 277 Mont. 284, 290, 922 P.2d 459, 462.

¶39.We agree Cheryl has made positive changes in her life since her children were removed from her care. However, C.J.L. and S.A.L. had been in DPHHS' custody for over two years--and B.L.M. had been in DPHHS' custody for her entire one-year life--by the time of the hearing. At that time, Cheryl still had not completed any of her eight court-approved treatment plans and was not consistently producing negative UA results. On this record, the possibility of long-term improvements with the passage of time simply cannot counter the District Court's finding that the conduct or condition rendering Cheryl unfit to parent her children is unlikely to change within a reasonable time.

¶40.We hold that substantial evidence supports the District Court's finding of fact that Cheryl's condition rendering her unfit to parent is unlikely to change within a reasonable time and the finding is not otherwise clearly erroneous.

¶41.Affirmed.

/S/ KARLA M. GRAY

We concur:

/S/ J. A. TURNAGE

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART

/S/ JIM REGNIER