No. 01-138

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 217N

IN THE MATTER OF P.M.B.,

A Youth in Need of Care.

APPEAL FROM: District Court of the Fourteenth Judicial District,

In and for the County of Musselshell,

The Honorable Roy C. Rodeghiero, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Bradley B. Parrish, Lewistown, Montana (Natural Mother)

Kevin Gillen, Billings, Montana (Natural Father)

For Guardian Ad Litem:

Robert W. Snively, Roundup, Montana

For Respondent:

Mike McGrath, Montana Attorney General, Jim Wheelis, Assistant Montana Attorney General; Catherine L. Truman, Musselshell County Attorney, Roundup, Montana, Linda Hickman, Special Deputy Musselshell County Attorney, Harlowton, Montana

Submitted on Briefs: June 29, 2001

Decided: November 6, 2001

Filed:

_____

Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent but shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.

¶2 The natural mother and father of P.M.B. both appeal the termination of their parental rights and grant of permanent custody to the Department of Public Health and Human Services of the youth, P.M.B., by the Fourteenth Judicial District Court, Musselshell County.

¶3 The sole issue before us is whether the District Court abused its discretion in terminating both the parents' parental rights. We affirm.

<strong>FACTUAL BACKGROUND</strong>

**¶4 P.M.B. is approximately 4 years old, and has been in the protective custody of the Department of Public Health and Human Services (Department) since being adjudicated a youth in need of care on May 26, 1998. After two years of working on several treatment plans, P.M.B.'s natural mother (J.B.) and father (P.B.) jointly moved the District Court to reinstate a visitation schedule. The District Court scheduled a hearing for June 22, 2000.**

¶5 At the hearing, the State presented witness testimony of P.B.,'s female relatives, including his daughter, sister, and two nieces. Each of these witnesses, now all adults, testified that P.B. sexually molested them when they were between the ages of four and

seven. The District Court found the witnesses to be credible and the evidence compelling, and concluded it was more likely than not that P.B. was a sexual offender. The court held there was probable cause to believe P.M.B., who was approaching the age of four, may be in danger of being abused or neglected, and ordered the Department to prepare an amended treatment plan that addressed P.B.'s sexual offender evaluation.

¶6 Following a psychosexual evaluation of P.B., the Department proceeded with termination, and did not amend P.B.'s treatment plan. The State asserted termination of parental rights was appropriate because: neither P.B. nor J.B. successfully completed their respective treatment plans; P.B.'s total denial of any sexual abuse meant he could not be treated and thus there was a moderate chance P.B. would re-offend; and J.B.'s refusal to believe or address any of P.B.'s history of sexual abuse indicated she could not properly protect P.M.B.

¶7 On November 16 and 17, 2000, the District Court held a hearing on the State's petition to terminate parental rights and for permanent custody. During the hearing, community social worker, Peggy Gillispie (Gillispie) testified as to her involvement with P.M.B.'s parents, and the progress with their respective treatment plans. Between the time P.M.B. was first adjudicated a youth in need of care and the date of the termination hearing, J.B. went through five treatment plans and addenda, while P.B. had four treatment plans and addenda.

¶8 We first address J.B.'s situation. Some of the re-occurring issues and goals J.B. was to work on throughout her treatment plans, included: addressing drug and alcohol dependency issues; establishing a stable, safe, and health-promoting home environment; demonstrating an ability to identify and meet the emotional needs of her child; and demonstrating an ability to provide an emotionally nurturing environment for her child.

¶9 In regards to her first treatment plan, J.B. failed to complete the following tasks: follow through with the recommendations from her psychological evaluation; complete an inpatient treatment program for chemical dependency; demonstrate any understanding of how her behavior and choices put her child at risk; develop an understanding of the concept of neglect and how it affects her child; establish and maintain a stable living environment (the couple lived in a vehicle until the last ten days of the treatment period); and maintain employment (J.B. was unemployed for all but five days of treatment period). Gillispie concluded J.B. was unsuccessful in her first treatment plan.

¶10 J.B. was given two addendums to the first plan. The first addendum allowed J.B. to address her chemical dependency through an outpatient program, but Gillispie testified there was not enough time to assess J.B.'s success. J.B. was also asked to address the aggressive and loud behaviors she exhibited towards professionals working on her case. The second addendum concerned visitation guidelines and Gillispie testified J.B. seemed to understand and follow through with the guidelines and rules regarding behaviors, noting that J.B. acted more appropriately during visits.

¶11 Under her second treatment plan, J.B. completed intensive outpatient therapy, maintained a home for a very short time, appeared to remain sober, obtained a requested psychological evaluation, and worked on parenting issues. However, at the end of the period, J.B. and P.B. moved into a shelter and then left the shelter without notifying Gillispie. J.B. was employed for one of the three months during this treatment plan period. Gillispie testified that although J.B. made significant progress, Gillispie did not believe J.B. had substantially complied with this treatment plan. She noted J.B.'s inability to understand how her decisions impacted her and her child, or the importance of the housing requirements. Overall, Gillispie testified J.B. had not made sufficient progress to consider the plan substantially complied with, but there was enough progress to continue working with her, concluding this plan "was partially complied with, but not substantially done."

¶12 When temporary legal custody was extended for six months, J.B. entered into her third treatment plan. This plan's main purpose was to continue J.B.'s psychological treatment. Although J.B. completed part of the recommendations from her psychological evaluation, she failed to complete the requested documentation of her treatment for depression. J.B. remained sober, attended AA meetings and most of the therapy appointments for P.M.B. However, J.B. did not develop insight into problems concerning neglect and risk issues with her child, such as providing appropriate housing, adequate food, or maintaining employment. According to Gillispie, both P.B. and J.B. did not understand how to plan for a child's needs, such as providing housing or necessary food. J.B. also did not understand that living in a camper, even for a short time, was not appropriate for a child. Gillispie testified as to continued concerns with employment, housing, meeting the child's needs, and making and keeping regular appointments. Gillispie continued, "[t]here was substantial progress made, but . . . it did not meet the requirements in order to say the child was no longer at risk." J.B. and P.B. "did not substantially comply enough that we would dismiss [the need for continued help]. There was [sic] too many concerns still out there."

¶13 Gillispie also reviewed P.B.'s progress in his treatment plans. Some of the goals of P.B.'s first treatment plan included: developing an understanding of parental responsibilities, including the need to provide for the emotional and physical needs of his child (i.e., shelter and employment); understanding the relationship between neglect and its effect on his child; providing a stable, safe, and health-promoting home environment; demonstrating an ability to protect P.M.B. from unsafe behavior of others, including J.B.; and demonstrating an ability to work cooperatively with the professionals involved in the case.

¶14 Gillispie noted the following in regards to P.B.'s progress in his first treatment plan: P.B. had not demonstrated any understanding of the issues and concerns as to his child's safety, or how his choices put P.M.B. at risk, nor did he demonstrate an understanding of what effect neglect has on his child; P.B. failed to comply with requests to complete anger assessment, or provide documentation that he completed a court order for counseling arising from a partnership assault conviction; he and J.B. lived in a pickup shell camper most of the treatment period; P.B. did not maintain employment, working only three days total in a temporary labor position; and P.B. failed to maintain regular contact with his social worker. Gillispie believed P.B. complied with such goals as staying drug and alcohol free and attending a parenting course.

¶15 P.B. was also given an addendum to his first treatment plan, which addressed specific visitation issues, such as controlling angry outbursts and appropriately interacting with his child and the professionals involved in this case. Gillispie testified that once P.B. understood why he should act more appropriately, he was able to comply with the addendum.

¶16 P.B.'s next treatment plan addressed the same issues as previous plans. Gillispie testified that P.B. did obtain a psychological evaluation as requested and signed the necessary releases. According to Gillispie, P.B. was not consistent in his ability to understand the situation, such as how to resolve problems regarding housing or putting his child at risk. P.B. did not complete outpatient treatment for chemical dependency, but did make some efforts at attending AA. Gillispie testified that P.B. made progress, but that he did not substantially maintain the progress to comply with the treatment plan.

¶17 In his final treatment plan, P.B. was to continue and complete the recommendations in the psychological evaluation. P.B. failed to complete outpatient treatment for chemical dependency, but did work on co-dependency issues in counseling and appeared to increase his knowledge in parenting classes. However, P.B. continued in his inability to understand

how his choices place the child at risk of harm and the importance of providing a healthy environment. According to Gillispie, P.B. was not able to communicate what neglect is or how it might impact his child. During this time, P.B. and J.B. changed residences several times (e.g., living at a dairy, a shelter, and a trailer) and were later homeless for a short period of time. Although P.B. worked at developing some skills through vocational rehabilitation and Gillispie was told P.B. had some work associated with that training, Gillispie did not receive any documentation that P.B. was employed. Gillispie testified that, "P.B. made some definite efforts . . . even more than he had in the past, but it did not meet the goals of the agreement which was to significantly reduce the risk of the child being at harm if she was returned."

¶18 At the hearing to terminate parental rights, the District Court also heard testimony from a clinical psychologist who evaluated both P.B. and J.B. She noted that P.B.'s IQ range of 60-70 made it difficult for him to be able to parent a child independently and affected his behavior, anger control, problem solving, ability to learn new information and ability to make parental decisions. As to J.B., the psychologist questioned J.B.'s ability to parent on her own as well, and noted that J.B. would not be able to protect P.M.B. from P.B. if the allegations as to P.B.'s sexual abuse were true. The psychologist recommended permanency for P.M.B.

¶19 A clinical social worker, who performed the psychosexual evaluation of P.B., testified that in his opinion, the allegations of sexual abuse were: fairly consistent in terms of what was described as the sexual offending behavior; supported by credible witness testimony; corroborated by other victims; and also consistent in regards to common cases of sexual abuse. The social worker testified that P.B. was most likely a sexual abuser and was at a moderate level of probability to re-offend. When asked about treating P.B., the social worker testified that P.B.'s absolute denial makes treatment extremely difficult, and that if P.B. did enter treatment, it could last from three to five years.

¶20 During the hearing, the court took judicial notice of the evidence and testimony from earlier hearings, including the June 22, 2000 hearing concerning allegations of P.B.'s sexual abuse. At the conclusion of the hearing, the District Court terminated the parental rights of P.B. and J.B. and awarded custody of P.M.B. to the Department. Each parent appeals the District Court's ruling.

## STANDARD OF REVIEW

¶21 We review a district court's decision to terminate parental rights to determine whether the court abused its discretion. *In re J.W.*, 2001 MT 86, ¶ 7, 305 Mont.149, ¶ 7, 23 P.3d 916, ¶ 7 (citation omitted). We review a district court's specific findings to determine whether they are clearly erroneous. *In re J.W.*, ¶ 7. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence or if, upon reviewing the record, this Court is left with the definite and firm conviction that the district court made a mistake. *In re J.W.*, ¶ 7. In reviewing a district court's conclusions of law, we determine if they are correct. *In re S.M.,* 1999 MT 36, ¶ 15, 293 Mont. 294, ¶ 15, 975 P.2d 334, ¶ 15 (citation omitted).

¶22 In determining whether to terminate parental rights, "the district court is bound to give primary consideration to the physical, mental, and emotional conditions and needs of the children," thus "the best interests of the children are of paramount concern in parental rights termination proceeding and take precedence over the parental rights." *In re J.W.*, ¶ 8 (citation omitted).

¶23 We have repeatedly recognized that "a natural parent's right to care and custody of a child is a fundamental liberty interest, which must be protected by fundamentally fair procedures." *In re E.W.,* 1998 MT 135, ¶ 12, 289 Mont. 190, ¶ 12, 959 P.2d 951, ¶ 12 (citation omitted). A district court must adequately address each applicable statutory requirement before terminating an individual's parental rights. *In re E.W.*, ¶ 12. The party seeking to terminate parental rights "must present clear and convincing evidence to the district court that the prerequisite statutory criteria for termination have been met." *In re E. W.*, ¶ 12. Further, we will presume that a district court's decision is correct and will not disturb it on appeal unless there is a mistake of law or a finding of fact not supported by substantial evidence that would amount to a clear abuse of discretion. *In re E.W.*, ¶ 14.

## DISCUSSION

¶24 **Did the District Court abuse its discretion in terminating both the parents' parental rights?**

¶25 A district court may terminate a person's parental rights to a child if it finds that the child has been adjudicated a youth in need of care, an appropriate court-approved treatment plan has not been complied with or has been unsuccessful, and the conduct or condition rendering the parent unfit is unlikely to change within a reasonable period of time. Section 41-3-609(1)(f), MCA.

¶26 Neither P.B. nor J.B. contest that P.M.B. was adjudicated a youth in need of care. Nor do the parents challenge the appropriateness or reasonableness of their treatment plans. Rather, P.B. and J.B. appeal the District Court's conclusion that treatment plans for both of them were unsuccessful, each contending they substantially complied with the treatment requirements. In addition, P.B. asserts that the District Court abused its discretion by terminating his parental rights without giving P.B. an opportunity to address treatment for allegations of sexual abuse.

¶27 In its findings of fact, the District Court found that the treatment plans were appropriate, but concluded they were not completed and thus could not be deemed successful. The court further found the evidence as to P.B.'s sexual abuse was compelling and that it is more likely than not P.B. is a sexual offender. The court found there is a moderate chance P.B. will re-offend and that P.B. cannot be treated due to P.B.'s denial of any sexual offenses. The court also found J.B. unable to protect P.M.B. from P.B. due to her complete denial of the allegations. The court found protection and permanency for the child to be paramount. In its conclusions of law, the District Court expressly gave primary consideration to the physical, mental, and emotional condition and needs of the child.

¶28 The record before us contains substantial evidence supporting the District Court's finding that both parents failed to successfully complete their treatment plans. The fact that P.B. and J.B. were able to complete some of their treatment goals does not conflict with the District Court's ruling that the treatment plans were unsuccessful. We have established that a treatment plan can be unsuccessful even when the tasks are completed. *In re S.M.,* ¶ 25 (citation omitted). Improvements and well-intentioned efforts do not establish either the completion or success of a treatment plan. *In re S.M.*, ¶ 31 (citation omitted).

¶29 Gillispie testified that although J.B. and P.B. made some progress in their treatment plans, overall there was not enough progress to demonstrate P.M.B. would not be at risk if returned to her parents. At the end of J.B.'s last treatment period, Gillispie continued to have concerns about J.B.'s ability to plan for and meet the child's needs, such as providing housing and food and maintaining employment. In addition, the clinical psychologist questioned J.B.'s ability to parent on her own, and noted that since J.B. denied P.B.'s sexual abuse history, J.B. would be unable to protect P.M.B. from P.B. Gillispie had similar concerns with P.B.'s ability to parent, noting his continued inability to understand how his choices place the child at risk and the importance of providing a safe and stable home environment. P.B. was unable to understand the concept of neglect, did not maintain

employment, and in the opinion of the clinical psychologist, was not capable of parenting on his own. In addition, his complete denial of all sexual abuse history made treatment extremely difficult.

¶30 We conclude there was more than sufficient substantial evidence to support the District Court's findings. The court did not misapprehend the effect of the evidence, nor are we left with a definite and firm conviction that a mistake has been committed. As a result, we conclude the District Court's findings that J.B. and P.B. failed to successfully complete their respective court-approved treatment plans and that P.M.B. continued to be at risk due to P.B.'s sexual abuse history are not clearly erroneous.

¶31 We further conclude the District Court adequately addressed the applicable statutory requirements pursuant to § 41-3-609, MCA, when it correctly concluded P.M.B. was adjudicated a youth in need of care; appropriate service treatments, approved by the court, were not complied with, or successfully completed by either of the parents; and that the parents' conduct rendering them unfit was unlikely to change in a reasonable time.

¶32 The District Court was presented with clear and convincing evidence that the statutory criteria of § 41-3-609, MCA, were met. We conclude the District Court did not abuse its discretion in terminating the parents' rights on the merits.

¶33 We therefore affirm.

/S/ PATRICIA COTTER

We Concur:

/S/ KARLA M. GRAY

/S/ JAMES C. NELSON

/S/ JIM REGNIER

/S/ JIM RICE